Cheryl J. HOPWOOD, Douglas W. Carvell, Kenneth R. Elliott, and David A. Rogers, Plaintiffs,

v.

The STATE OF TEXAS; University of Texas Board of Regents; Bernard Rapoport, Ellen C. Temple, Lowell H. Lebermann, Jr., Robert J. Cruikshank, Thomas O. Hicks, Zan W. Holmes, Tom Loeffler, Mario E. Ramirez, and Martha E. Smiley, as members of the Board, in their official capacities; University of Texas at Austin; Robert M. Berdahl, President of the University of Texas at Austin in his official capacity; University of Texas School of Law; Mark G. Yudof, Dean of the University of Texas School of Law in his official capacity; Stanley M. Johanson, Professor of Law in his official capacity, Defendants.

No. A 92 CA 563 SS.

United States District Court,
W.D. Texas,
Austin Division.

Aug. 19, 1994.

---

Terral Ray Smith, Small, Craig & Werkenthin, Steven W. Smith, Austin, TX, Joseph A. Shea, Jr., Michael P. McDonald, Vincent A. Mulloy, Center for Individual Rights, Washington, DC, R. Kenneth Wheeler, Wallace, Harris, Sims & Wheeler, Richmond, VA, Joseph A. Wallace, Wallace, Harris & Sims, Elkins, WV, Paul J. Harris, Wallace, Harris, Sims & Wheeler, Richmond, VA, Michael E. Rosman, Center for Individual Rights, Washington, DC, for plaintiffs.

Harry M. Reasoner, Allan Van Fleet, Betty Owens, Vinson & Elkins, Houston, TX, Javier Aguilar, Sp. Asst. Atty. Gen., Toni Hunter, Atty. General's Office, Sarah L. Anderson, Tex. Atty. Gen., Samuel Issacharoff, Charles Alan Wright, University of Texas School of Law, R. Scott Placek, Barry D. Burgdorf, Vinson & Elkins, Austin, TX, for defendants.

## MEMORANDUM OPINION

SPARKS, District Judge.

The plaintiffs, Cheryl J. Hopwood, a white female, and Douglas W. Carvell, Kenneth R. Elliott, and David A. Rogers, three white males, have brought suit against the defendants [1] alleging violations of the Fourteenth Amendment, 42 U.S.C.A. § 1981 (West Supp. 1994), 42 U.S.C.A. § 1983 (West 1981), and Title VI of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000d (West 1981).[2] All of these provisions prohibit discrimination because of race. For the alleged violations, the plaintiffs seek injunctive and declaratory relief, as well as compensatory and punitive damages. The plaintiffs contend the defendants discriminated against them by favoring less qualified black and Mexican American applicants for admission to the University of Texas School of Law through the use of a quota system. This cause was tried before the Court, without a jury, on May 16th through May 20th and May 23rd through May 25th, 1994.

The cause focuses on one of the most divisive issues faced by society, affirmative action, and highlights the tension that exists when the individual rights of nonminorities come into conflict with programs designed to aid minorities. The plaintiffs have contended that any preferential treatment to a group based on race violates the Fourteenth Amendment and, therefore, is unconstitutional. However, such a simplistic application of the Fourteenth Amendment would ignore the long history of pervasive racial discrimination in our society that the Fourteenth Amendment was adopted to remedy and the complexities of achieving the societal goal of overcoming the past effects of that discrimination. Further, the Supreme Court, which is continually faced with trying to reconcile the meaning of words written over a century ago with the realities of the latter twentieth century, has declined to succumb to an original intent or strict constructionist argument. Therefore, the Court will decline the plain-

1. Defendants Bernard Rapopart, Ellen C. Temple, Lowell H. Lebermann, Jr., Robert Cruikshank, Thomas O. Hicks, Zan W. Holmes, Jr., Tom Loeffler, Mario E. Ramirez, and Martha E. Smiley are sued in their official capacities as members of the University of Texas Board of Regents. Defendant University of Texas Board of Regents is the governmental entity created by Defendant State of Texas to administer the operation of the University of Texas system, which includes Defendant University of Texas at Austin as a component institution. Defendant University of Texas School of Law is an American Bar Association accredited law school operated by the University of Texas at Austin. Defendant Robert M. Berdahl is sued in his official capacity as president of the University of Texas at Austin.

Defendant Mark G. Yudof is currently Provost of the University of Texas at Austin. At all times pertinent to this lawsuit, Yudof was Dean of the University of Texas School of Law and is sued in that official capacity. Defendant Stanley M. Johanson, a Professor of Law, is sued in his official capacity as Chair of the University of Texas School of Law Admissions Committee.

2. The plaintiffs' Title VI, § 1981, and § 1983 claims serve as vehicles to enforce underlying rights guaranteed by the Fourteenth Amendment. Therefore, the law school's admissions program must be evaluated under the equal-protection clause of the Fourteenth Amendment.

tiffs' invitation to ignore the law established by the highest court of this land and to declare affirmative action based on racial preferences as unconstitutional *per se.* The issue before the Court is whether the affirmative action program employed in 1992 by the law school in its admissions procedure met the legal standard required for such programs to pass constitutional muster. The Court, having carefully considered the evidence presented at trial, the arguments of counsel, and the briefing provided by the parties, finds that it did not.

## I. HISTORICAL BACKGROUND

The reasoning behind affirmative action is simple—because society has a long history of discriminating against minorities, it is not realistic to assume that the removal of barriers can suddenly make minority individuals equal and able to avail themselves of all opportunities. Therefore, an evaluation of the purpose and necessity of affirmative action in Texas' system of higher education requires an understanding of past discrimination against blacks and Mexican Americans, the minorities receiving preferences in this cause, and the types of barriers these minorities have encountered in the educational system.

### A. Discrimination in Primary and Secondary Education

The history of official discrimination in primary and secondary education in Texas is well documented in history books, case law, and the record of this trial. The Court, therefore, will address it only in summary fashion.

Even after the Supreme Court's decision in *Brown v. Board of Education,* the State of Texas adopted a policy of official resistance to integration of its public schools. This policy of resistance resulted in numerous lawsuits and court-imposed desegregation plans throughout the past twenty years. *Wright,* vol. 19 at 38–44; *Romo,* vol. 17 at 45–51. Many of the school districts found to be operating dual systems of education were

also found to practice official discrimination against black and Mexican American students. *Wright,* vol. 19 at 40–43; *Romo,* vol. 17 at 45–51; *Rodriguez,* vol. 17 at 8–9.

The problem of segregated schools is not a relic of the past. Despite the fact that the public school population is approximately half white and half minority, minority students in Texas attend primarily majority minority schools while white students attend primarily white schools. *Glenn,* vol. 23 at 46–49. Further, as of May 1994, desegregation lawsuits remain pending against over forty Texas school districts. D–457; *see also* D–370, 373, 419; *Wright,* vol. 19 at 38–40; *Romo,* vol. 17 at 45–46.

The lack of educational opportunity for minorities has been compounded by the lower socioeconomic status of minorities in Texas. Statistics continue to indicate significant disparities between minority and nonminority students in skills and academic knowledge attained in the public schools. Although the generally lower socioeconomic status of black and Mexican American families is partially accountable for some of the disparities, the gap is exacerbated by historically inferior educational preparation of minorities. *Glenn,* vol. 23 at 30–36. Further, at each educational level, there is a marked decline in the level of attainment by minorities, as reflected in comparison of drop-out rates between minorities and nonminorities and the percentages of the respective groups that graduate from high school and college.[3]

### B. Discrimination in Higher Education

As with primary and secondary education, Texas' system of higher education has a history of state-sanctioned discrimination. Discrimination against blacks in the state system of higher education is well documented in history books, case law, and the State's legislative history. The State of Texas, by constitution and statute, previously required the maintenance of "separate schools ... for the white and colored children." *See* Tex. Const. art. VII, § 7 (1925, repealed 1969).

---

**3.** In 1990, the percentage of persons age 25 or older who completed high school was 81.5% non-Hispanic white, 66.1% black, and 44.6% Hispanic. D–411. College graduate rates for the same year reflect 25.2% non-Hispanic whites, 12% black, and 7.3% Hispanic. D–412.

This policy resulted in the establishment of segregated schools for blacks that were inferior to the white schools. Further, opportunities available to blacks to attend college were extremely limited.[4]

In 1946, when Heman Sweatt, a black man, sought admission to the law school and was refused admission, a Texas court, while holding that Article VII, Section 7 of the Texas Constitution precluded his admission, ordered the state to provide a law school for blacks. *See Sweatt v. Painter*, 210 S.W.2d 442 (Tex.Civ.App.—Austin 1948). The State hastily created a makeshift law school that had no permanent staff, no library staff, no facilities, and was not accredited. *Sweatt v. Painter*, 339 U.S. 629, 632, 70 S.Ct. 848, 849–50, 94 L.Ed. 1114 (1950). In 1950, a unanimous United States Supreme Court ruled that the State of Texas' provisions regarding the legal education of white and minority students violated the Fourteenth Amendment and ordered that Sweatt be admitted to the previously all-white University of Texas School of Law. *Sweatt*, 339 U.S. at 636, 70 S.Ct. at 851. Sweatt left the law school in 1951 without graduating after being subjected to racial slurs from students and professors, cross burnings, and tire slashings. *Wright*, vol. 19 at 24–25.

The *Sweatt* case is the most flagrant incident of state-sanctioned discrimination occurring against blacks at the University of Texas. However, the record reflects that during the 1950s, and into the 1960s, the University of Texas continued to implement discriminatory policies against both black and Mexican American students. Mexican American students were segregated in on-campus housing and assigned to a dormitory known as the "barracks," as well as excluded from membership in most university-sponsored organizations. *Romo*, vol. 17 at 43. Additionally, until the mid 1960s, the Board of Regents policy prohibited blacks from living in or visiting white dormitories. *Wright*, vol. 19 at 26–28; D–482.

Beginning in the mid 1970s, discrimination in Texas' system of higher education came under attack through a court-ordered investigation by the Department of Health, Education and Welfare (HEW) Office for Civil Rights (OCR). The investigation of Texas' system resulted from a lawsuit initiated in 1970 to require HEW to take action to enforce the provisions of Title VI.[5] The court-

---

4. The Texas Legislature created Prairie View State Normal & Industrial College for Colored Teachers at Prairie View (now Prairie View A & M University) for the education of "students to be taken from the colored population of this State." *Wright*, vol. 19, at 17, 19–21. Until 1947, it remained the only state-supported institution of higher learning open to black students in Texas; no type of professional training was available to blacks. *Commentary*, Tex. Const. art. VII, § 14 (West 1993). In 1947, to avoid integration of the University of Texas, the Texas Legislature created the Texas State University for Negroes (now Texas Southern University). *Id.* at 21–22; D–382.

5. *See Adams v. Richardson*, 356 F.Supp. 92 (D.D.C.), *modified and aff'd*, 480 F.2d 1159 (D.C.Cir.1973), *dismissed sub nom. Women's Equity Action League v. Cavazos*, 906 F.2d 742 (D.C.Cir.1990).

Title VI proscribes discrimination that violates the equal protection clause of the Fourteenth Amendment. *See Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 286–87, 98 S.Ct. 2733, 2746–2747, 57 L.Ed.2d 750 (1978). The prohibitions against discriminatory conduct contained in Title VI govern "program[s] or activit[ies] receiving Federal financial assistance." 42 U.S.C.A. § 2000d. Thus, "Congress was legislat-

ing to assure federal funds would not be used in an improper manner." *United Steelworkers v. Weber*, 443 U.S. 193, 206 n. 6, 99 S.Ct. 2721, 2729 n. 6, 61 L.Ed.2d 480 (1979). The University of Texas, as a recipient of Title VI funds, is required to comply with Title VI.

The Department of Education, as the successor agency to HEW, is the governmental agency charged with the enforcement of Title VI and the review of programs funded through the DOE. The DOE has promulgated regulations to implement the provisions of Title VI, including regulations providing for affirmative action in certain circumstances. The regulations state that "[i]n administering a program regarding which the recipient has previously discriminated against persons on the ground of race, color, or national origin, the recipient must take affirmative action to overcome the effects of the prior discrimination." 45 C.F.R. § 80.3(b)(6)(i) (1993). The regulations state further that even if a recipient has never implemented discriminatory policies, if its services and benefits have not been equally available to some racial or nationality groups, the recipient may "establish special recruitment policies to make its program better known and more readily available to such group, and take other steps to provide that group with more adequate service." 45 C.F.R. § 80.5(j).

ordered investigation of ten states, which did not include Texas, began in 1973. In 1977, the court extended the order to an additional six states, which included Texas. *Ashworth,* vol. 12 at 8; D–296.

Between 1978 and 1980, the OCR conducted an investigation of Texas' public higher education system. The investigation culminated in a finding that Texas had "failed to eliminate vestiges of its former *de jure* racially dual system of public higher education, a system which segregated blacks and whites." D–297. Additionally, the OCR found that Hispanics were significantly underrepresented in state institutions and indicated it would continue its investigation of discrimination against Hispanics. *Id.*

During the early 1980s, the OCR and Texas officials engaged in considerable negotiations regarding efforts to bring Texas into compliance with Title VI. Texas, in an effort to achieve a state-wide desegregation plan acceptable to the OCR, attempted to address OCR concerns through submission of the Texas Equal Education Opportunity Plan for Higher Education (Texas Plan), which included a commitment to the goal of equal educational opportunity and student body desegregation for both black and Hispanic students. D–237. In 1982, Assistant Secretary of Education Clarence Thomas informed Governor Clements that the Texas Plan was deficient because the numeric goals of black and Hispanic enrollment in graduate and professional programs were insufficient to meet Texas' commitment to enroll those minority students in proportion to the representation among graduates of the state's undergraduate institutions. *Ashworth,* vol. 12 at 16–17; D–284. Texas revised its plan and resubmitted it to the OCR; the OCR found the modified plan to be deficient because it did not set targets for increasing minority enrollment for each institution, instead of on a statewide basis, and it did not project

achievement dates for the targeted goals. *Ashworth,* vol. 12 at 19–20; D–219.

In 1983, the District Court for the District of Columbia entered an order in the ongoing Title VI-enforcement suit, in which the court found that "Texas has still not committed itself to the elements of a desegregation plan which in defendants' judgment complies with Title VI." D–446. The court ordered the DOE to begin enforcement proceedings against Texas unless Texas submitted a plan in full conformity with Title VI within forty-five days. *Ashworth,* vol. 12 at 22–23; D–446. In response to the order, the OCR submitted thirty-seven suggested measures for increasing black and Hispanic student enrollment in professional and graduate programs at traditionally white institutions. Among the suggestions were that each graduate and professional school should re-evaluate its admissions criteria and that "admissions officers will consider each candidate's entire record and will admit black and Hispanic students who demonstrate potential for success but who do not necessarily meet all the traditional admission requirements." D–220.

In June 1983, the Texas Plan, as amended to account for the deficiencies identified by the OCR, was accepted by OCR as being in compliance with Title VI.[6] However, acceptance was contingent on adequate funding and completion of key activities within a specified time. D–314. Further, the Texas Plan was subject to monitoring for compliance until 1988. *Ashworth,* vol. 12 at 23, 25–26.

In November 1987, OCR contacted the state regarding the expiration of the plan in 1988 and indicated OCR would perform a final evaluation to determine if further action would be necessary to bring Texas into compliance with Title VI. OCR further instructed state officials that, pending the evaluation, Texas should continue to operate under the plan. *Ashworth,* vol. 12 at 32–34; D–323.

---

6. D–314. The revised plan raised the goal previously set for increased minority enrollment in graduate and professional schools. The individual goal for UT–Austin had been ten additional black students and two additional Hispanic students. *Ashworth,* vol. 12 at 26–27; vol. 13 at 56–58. The revised plan included a commitment to

"seek to achieve proportions of black and Hispanic Texas graduates from undergraduate institutions in the State who enter graduate study or professional schools in the State at least equal to the proportion of white Texas graduates from undergraduate institutions in the State who enter such programs." D–238a at 5.

Because Texas Higher Education Coordinating Board officials determined Texas had not met the goals and objectives of the plan, the board voluntarily developed a successor plan (Plan II) to avoid a mandate from the federal government to negotiate another plan. *Ashworth,* vol. 12 at 34–35; vol. 13 at 45–46. Plan II did not contain any specific numeric enrollment goals but retained Texas' commitment to increasing black and Hispanic student enrollment. D–326 at 9.

To date, OCR has not completed its evaluation to determine if Texas is in compliance with Title VI.[7] However, in January 1994, the DOE notified Governor Richards that OCR was continuing to oversee Texas' efforts to eliminate all vestiges of *de jure* segregation and that it would be reviewing the Texas system in light of *United States v. Fordice,* —— U.S. ——, 112 S.Ct. 2727, 120 L.Ed.2d 575 (1992). *Ashworth,* vol. 12 at 35–38; D–293.

Against this historical backdrop, the law school's commitment to affirmative action in the admissions process evolved.

## II.  THE ADMISSIONS PROCESS

### A.  Evolution of the Admissions Process and Affirmative Action

The law school's admissions procedure was not always a complicated process. In the early 1960s, all applicants who had taken the LSAT and had at least a 2.0 or 2.2 grade point average on a 4.0 scale were accepted.[8] In about 1965, the number of applicants began to significantly exceed the law school's capacity, and, as a result, the law school established additional criteria to aid in the selection process. *Smith depo.* at 7–8.

Under the more selective system, a baseline was established each year based on the Texas Index (TI).[9] The law school automatically admitted applicants whose TI exceeded the baseline, and the admissions committee reviewed applicants whose TI was below the baseline. This procedure was used until the late 1960s when an inundation of applications meeting the baseline criterion created a class of more students than could be adequately accommodated and precluded review of those who did not qualify for automatic admission. That particular year, the first-year class of law students consisted of almost 700 students. *Johanson,* vol. 3 at 14.

As a result, the law school modified the admissions process and changed the automatic admission baseline to a presumptive admission score. Additionally, the admissions committee began to use a presumptive denial baseline, and applicants whose TI fell below that baseline were presumptively denied admission. Also during the late 1960s, the law school began implementing affirmative action by attempting to recruit minority individuals who had performed well in the CLEO program.[10] The only race or ethnic-based scholarships available during this time, however, were limited to "whites only." *Smith depo.* at 12.

A perception began to develop that the CLEO program had shifted its focus from students who were just below the level where law schools would seriously consider them for admission to students who were significantly below that level. *Smith depo.* at 14–16. Therefore, those responsible for admissions

---

7.  *Ashworth,* vol. 12 at 32–24. The government, as usual, proceeds with "all deliberate speed."

8.  *Johanson,* vol. 3 at 12. Ernest Smith, who was a member of the admissions committee from 1965 through 1970 and dean of the law school from 1974 to 1979, testified by deposition that his recall of the required grade point average at that time was 3.0. *Smith depo.* at 7. Although neither Smith nor Johanson had exact recall of the number, their testimony is consistent in that the qualifications for admission at the time were minimal.

9.  The Texas Index is a composite number calculated by the Law School Data Assembly Service (LSDAS) that reflects an applicant's grade point average and LSAT score. The weight attributed to each component of the TI is determined by a prediction formula derived from the success of first year students in preceding years. *Johanson,* vol. 3 at 7–10.

10.  The CLEO (Council on Legal Education Opportunity) program provided summer training at participating law schools for minority graduates of various universities. At the end of the training period, the CLEO participants were given exams. Based on their performance on those exams, some of the participants were admitted to the law school. *Smith depo.* at 9–10.

at the law school felt that the CLEO program could not successfully prepare the participants in one summer to be competitive students in a regular law school class. *Id.* at 16. Additionally, minorities represented only a small percentage of the entire pool of applicants to the law school, and law schools around the country competed for the top minority applicants. *Id.* at 18. In 1971, after the law school terminated its participation in the CLEO program, the law school admitted no black students. *Wright,* vol. 19 at 32.

In the early 1970s, because of the university's concern over the few minority students enrolled in the law school, a separate admissions committee, informally called the "Treece committee,"[11] was formed to consider applications from minority students and disadvantaged nonminority students.[12] The purpose of the committee was to ensure that the applicants the committee reviewed received "fuller consideration" than they would have in the regular admissions process. *Smith depo.* at 16. The applicants were evaluated separately from the applicants before the regular admissions committee, and the sole criterion for applicants before the Treece Committee was whether the applicant had a reasonable prospect of passing the first year.[13] The Treece committee had no set goals for the number of admissions to be made through the committee, and the number of applicants it admitted had little impact on the regular admissions.[14] In 1977, the Treece committee considered 500 applicants, including approximately 100 nonminority applicants. Of these applicants, the Treece committee admitted sixty-eight minority students and three nonminority students. "Thus, while the special subcommittee did

consider and grant admission to some white applicants, the predominant objective of the special subcommittee was to increase minority enrollment at the Law School." P–1 (Smith memo to Rogers, Oct. 18, 1978, at 1).

The applications before the regular admissions committee were subjected to a different process. Because of the volume of applications, the admissions committee could not give individual consideration to each application. Therefore, the law school implemented a three-category system to narrow the pool of applications requiring committee consideration. The first category of applicants, those with TIs above a certain number, were granted "administrative admission"; that is, administrative personnel automatically sent offers of admission to these applicants based on the applicants' TIs. A "presumptive denial" category was at the other end of the scale, in which administrative personnel screened the applications based on specified criteria. If the administrative person determined the file warranted further consideration, the file was sent to the regular admissions committee. The admissions committee reviewed the individual applications in the middle category or "discretionary zone," which included those referred to the committee from the presumptive denial category.

The law school used this admissions procedure until 1978 when, as a result of the Supreme Court's decision in *Bakke,* the law school reassessed its minority admissions procedure. The law school determined that, although its procedure differed from that at issue in *Bakke,* the use of the separate committees to evaluate applicants was defective.[15] Therefore, then Dean Smith directed

---

11. The committee was named after the chair of the committee, Professor James Treece.

12. In the summer of 1974, just before Ernest Smith became dean of the law school, the then president of the university, Steve Spurr, expressed concern about the low minority population in the law school. Spurr indicated that a public university had an obligation to train a reasonably representative cross-section of the population in the law and that the TI, as the focus of the admissions procedure, did not adequately account for an applicant's ability to overcome past economic, cultural, and discriminatory practices. *Smith depo.* at 17.

13. *Johanson,* vol. 3 at 15. Professor Johanson did not recall if any of the members of the Treece committee were also members of the regular admissions committee.

14. During this time, the law school entering class was comprised of 500 students, and no more than 10% of the students could be nonresidents. *Johanson,* vol. 3 at 17.

15. The law school's procedure differed from the *Bakke* procedure in that no fixed number of seats were set aside for minorities and some nonminorities were evaluated by the Treece committee. P–1 (Smith memo at 3).

the admissions committee to operate as one unit rather than as two subcommittees and instructed the committee to establish the administrative admission and presumptive denial lines at levels that would increase the number of applicants given individual consideration. P–1.

After 1978, Johanson set the lines to allow for a reasonable number of minority candidates to be included with nonminorities in the discretionary zone. *Johanson*, vol. 3 at 21. The discretionary zone was then divided into five or six "bands."[16] The law school offered admission to a set percentage of applicants from each band. The percentage decreased from the first or top band to the last, a reflection of the diminishing credentials of the bands. The minority applicants were primarily clustered in the lower bands with few in the upper bands. *Wellborn*, vol. 24 at 45.

Within each band, minority and nonminority files were blended into groups of thirty. Each pile was reviewed by three committee members, each of whom was allocated a certain fixed number of votes determined by the yield desired from a particular band. Therefore, each member of the committee ultimately had total discretion to decide whether and what extent to implement affirmative action for each pile of files that person reviewed. *Wellborn*, vol. 24 at 9. Professor Wellborn testified he and other faculty members perceived two problems with this system: 1) potential unfairness to nonminority candidates who could be affected by affirmative action solely as a result of the pile in which they were included and 2) the application of personal affirmative action efforts, requiring no justification to the committee as a whole, rather than a system based on a set policy. As a result, in 1980, the law school

abandoned the banding admissions procedure and formed the minority subcommittee.

The minority subcommittee was a part of the full committee that reviewed and voted on nonminority files. All minority files below the presumptive admission line were studied by the minority subcommittee.[17] The subcommittee would then bring its recommendations to the full committee. At some point during the middle of the admissions process, the subcommittee would present a report to the full committee that summarized the features of the minority files being recommended for admission. The actual files were also available at the meeting so the full committee could make its own determinations about the recommended minority applicants in comparison to the nonminority applications pending at the time. At this point in the process, the members of the full committee were involved in reading piles of nonminority files and were cognizant of the qualifications of the nonminorities. Although this method often resulted in heated discussion and disagreement among committee members over whether to admit a particular candidate, the process also provided open discussion rather than the silent voting, which could have reflected personal agendas, that occurred with the banding procedure. *Wellborn*, vol. 24 at 15.

In the early 1980s, during these meetings, the committee members spent considerable time debating whether individual minority candidates met minimum admissions standards and, thus, could do passing work in law school. As a result, the full committee often examined specific minority files. The ultimate effect was that the entire committee voted on each minority applicant that the subcommittee brought before the full committee. *Goode*, vol. 9 at 6. However, as the

---

16. Professor Johanson testified the system used five bands, while Professor Wellborn testified there were six bands.

17. Evidently, sometime between 1978 and 1991, the automatic or administrative admission line was changed to a presumptive admission line. The testimony is unclear as to when this occurred and, apparently, even after the change was made, those involved with the admissions procedure continued to make reference to automatic admission. *Johanson*, vol. 3 at 26, 66; *see*

*also id.* at 29 ("I think we used the term 'automatic admit' for a long period of time, when it became part of the colloquium but did not describe the process."). Dean Sutton, who succeeded Dean Smith and was dean from 1979 to 1984, established the rule that approximately 55% of the resident class should fall within the presumptive admission category. *Johanson*, vol. 3 at 24–25. Approximately 75% of nonresident applicants are admitted from the presumptive admission category for nonresidents. *Id.*

pool of minority candidates improved, the focus of the meetings shifted to choosing among minority candidates that the committee knew, based on their TIs, could succeed in law school. *Wellborn*, vol. 24 at 33. Therefore, less full committee review of each individual file became necessary.[18]

Ultimately, the admissions committee determined that the process was inefficient and not the most effective way of processing minority applicants. *Johanson*, vol. 5 at 27. In April 1991, "[a]fter considerable debate, the [admissions] committee, over some strong opposition, directed the chair [Johanson] to form a subcommittee (including Deans Aleman and Hamilton and the two minority students) which was to review the minority files and recommend sufficient candidates for admission to achieve a class that was 5% Black and 10% MA." [19] Therefore, by 1992, the full admissions committee no longer selected individual applicants for admission. *Wellborn*, vol. 24 at 53. Instead, the minority subcommittee compiled a list and presented it to the full committee, which made a judgment of how many offers to give to minority applicants. The minority subcommittee was then delegated the task of deciding which individual minority applicants were to receive offers of admission. Thus, by 1992, the admissions process, although involving some interaction and exchange of information between the full committee and minority subcommittee, was markedly similar to the pre-*Bakke* procedure of two separate committees. This 1992 procedure is the crux of this lawsuit.

## B. 1992 Admissions Process

In 1992, the admissions committee was comprised of nine professors, two assistant deans, and four students. *Johanson*, vol. 6 at 26. The minority subcommittee was comprised of Johanson, Aleman, and Hamilton, all of whom were also members of the full committee.[20] Aleman, however, did not participate in reviewing nonminority applications. *Johanson*, vol. 6 at 25–26.

In 1992 when an application arrived, administrative personnel placed it in an individual folder, to which additional materials, such as letters of recommendation, were added as they arrived at the law school. Each folder was color-coded based on two criteria: residency and race or ethnicity. The residency classification indicated whether the applicant was a resident or nonresident of Texas. The race or ethnicity classification was based on which of several boxes the applicant checked on the application: Black/African American, Native American, Asian American, Mexican American, Other Hispanic, White, or Other. *Hamilton*, vol. 2 at 19–20.

The application deadline was February 1. However, because the law school wished to get early offers sent to top applicants in late January if possible, Johanson drew initial presumptive admission lines as soon as he had an initial computer printout showing the numbers and qualifications of the applicants. *Johanson*, vol. 3 at 26–27. At this point, about half of the applications were complete; therefore, Johanson drew the initial lines relatively high to avoid too many early offers of admission before the quality of the entire pool of applicants was defined.[21] The goal of

18. Because the law school was receiving better qualified minority applicants, the focus of the process changed from whether to accept a particular minority applicant to a more selective process between the individual minority applicants. *Wellborn*, vol. 24 at 33. Had the admissions committee continued to apply its previous standards, the number of minorities in the entering class would have continued to grow. However, the committee elected instead to "take advantage of this opportunity to have more excellent minority students than we had before, who would be more competitive with the non-minority students, but perhaps in more limited numbers that would still constitute reasonable representation." *Id.* at 35.

19. P–25. The percentage goals are based on the percentages of minority college graduates. *See supra* note 6.

20. Professor Johanson, who is white, has been on the admissions committee since 1964 and chair of the committee since 1973. Dean Aleman is an assistant dean and is Mexican American. Dean Hamilton was an assistant dean from 1990 through 1993 and is black.

21. At some point in the process, the presumptive admission line for nonminority resident admissions was adjusted downward to ensure that approximately 55% of the resident admissions would be presumptively admitted. The 55/45 split did not apply to nonresident applicants,

the initial presumptive admission lines Johanson drew was to ensure that the top candidates in each category received offers of admission from the law school as soon as possible.[22]

Once Johanson determined which files were in the presumptive admission category, he conducted a preliminary review of the files.[23] By the end of the admissions process, Johanson reviewed 300 to 350 resident files and 200 to 250 nonresident files in this category. *Johanson*, vol. 3 at 32–35. In his review of these files, Johanson checked to see if the applicant's TI was inflated by high grades in a noncompetitive major or at a weak school or if there was some other questionable feature of the applicant's file. Johanson generally held those files for further review in the discretionary zone. Johanson dropped approximately ten percent of the presumptive admission applicants into the discretionary category. Those applicants with a high TI reflecting a high LSAT and high grades in a rigorous major at a leading undergraduate institution were admitted by Johanson, who had unilateral authority to admit any applicant in this category without further consultation with the full admissions committee. D–362.

At the other end of the spectrum, Johanson set another line, and applicants whose TIs fell below that line were presumptively denied admission. One or two members of the admissions committee reviewed each application in this category to determine if the

TI adequately reflected the applicant's likelihood of success in law school or competitive standing relative to the entire applicant pool. *Johanson*, vol. 3 at 31–32; P–41; D–362. Generally, as a result of this review, twenty to forty files were upgraded from the presumptive denial zone to the discretionary zone, although Johanson did not recall the specific number of files moved to the discretionary zone in 1992. *Johanson*, vol. 5 at 24–25.

The middle category was comprised of those applicants whose TIs fell between the presumptive denial line and the presumptive admission line, those applicants who Johanson had moved down from the presumptive admission category, and those applicants who reviewers had moved up from the presumptive denial category. In the middle discretionary category, reviewers focused less attention on the applicant's numbers, as all were relatively close, and instead carefully evaluated the applicant's qualifications as reflected by the entire file. *Goode*, vol. 9 at 4; D–362.

The standards the law school applied to assess applicants in this system differed based on race and national origin in two ways. First, Johanson's determination of the presumptive admission and denial TIs varied between nonminorities and minorities.[24] By March 1992, Johanson had lowered the presumptive admission score for resident nonminorities from a threshold setting of 202/90 to 199/87.[25] Similarly, Johanson lowered the

---

approximately 75% of whom were admitted presumptively on the basis of their TI. *See supra* note 17.

**22.** *Johanson*, vol. 3 at 26. In 1992, the law school received approximately 2100 resident applications and 2300 nonresident applications. *Johanson*, vol. 3 at 35. The pool of nonresident applicants was very strong, many with credentials well above those of the presumptively admitted residents. *Id.* at 36. Accordingly, the presumptive admission and denial scores were set at a higher level for nonresident applicants. However, as with resident applicants, lower scores were set for Mexican American and black nonresident applicants than for nonminority nonresident applicants.

Johanson testified the enrollment yield for nonresidents is approximately 26%, meaning that the law school has to offer approximately four nonresidents admission to enroll one. *Id.* at 37.

The enrollment yield for residents is 66 to 68%, that is, for every 100 offers of admission, 66 to 68 resident applicants accept.

**23.** Johanson reviewed minority and nonminority files together as a group during the preliminary review process. *Johanson*, vol. 6 at 55.

**24.** Johanson's setting of these scores was a process that evolved over the course of the admissions process based on the pool of applicants, the number of offers, and the number of acceptances. Initially, the numbers were set high and lowered as the yield from offers and composition of the entering class began to develop. *Johanson*, vol. 5, at 10–11; P–38—P–44.

**25.** P–38. In 1992, the law school was faced with two different types of TIs, one based on a two digit LSAT score and one based on a three digit

presumptive admission score for Mexican American applicants from 196/84 to 189/78 and the presumptive admission score for black applicants from 192/80 to 189/78. P–49. The presumptive denial score for nonminorities was 192/80, and the presumptive denial score for blacks and Mexican Americans was 179/69. Thus, the presumptive denial score for nonminorities was higher than the presumptive admission score for minorities.

Additionally, the law school admissions committee had different procedures for the review of nonminority and minority files in the discretionary zone. Nonminority files were divided into stacks of thirty, which were reviewed by three members of the admissions committee.[26] Each person on the three-person subcommittee voted, on an individual basis with no verbal or written explanation, to offer admission to a set number of applicants from within the stack of thirty files.[27] After the three members completed their independent screening of the files, Johanson compiled a master tally sheet reflecting the number of votes received by each applicant in the group of thirty-five. See, e.g., P–73. Subject to Johanson's review, those applicants that received two or three votes were offered admission.[28] In 1992, the law school made an average of nine offers of admission per stack. P–58. Those who received no votes were automatically denied

admission at that time.[29] The law school sent a letter offering applicants who received one vote a place on the waiting list.

The minority subcommittee reviewed the minority files. In theory, each member of the subcommittee was to be part of the three-person subcommittees that reviewed the nonminority files. The testimony reflected, however, that in 1992 Aleman was not on any of the nonminority screening subcommittees. Compare D–362 with Johanson, vol. 6 at 26. According to the testimony, instead of each member of the minority subcommittee performing an individual review of the minority files, as was the procedure for review of nonminority files, the minority subcommittee met as a group and reviewed each minority applicant's file.[30] The subcommittee did not review a set number of files at each meeting but, instead, made as many decisions as the members felt comfortable with until their "decision-making powers started to wane." Johanson, vol. 5 at 30. Resident presumptive denial minority files were screened exclusively by Johanson and Hamilton. Id. at 25.

The members of the minority subcommittee attended the meeting of the full committee and provided the full committee with a summary of the files the subcommittee believed to be good applicants for admission. Wellborn, vol. 24 at 18. Although the evi-

---

LSAT score. This was a result of the change in the scaling of the LSAT from a 10–to–48 scale to a 120–to–180 scale. Johanson therefore had to set presumptive lines coordinated to two separate TI formulas to accommodate the two types of TIs received for applicants. Johanson, vol. 3 at 26–27.

26. In 1992, the admissions committee reviewed 18 stacks in the nonminority discretionary zone—17 stacks of 30 files and one stack of 16 files. P–58, P–59. This process began in early March and was virtually complete by mid to late April. Johanson (by depo.), vol. 25 at 7.

27. In 1992, Johanson allotted each person on the subcommittees nine votes per stack. D–332 at A–29. Committee members were required to screen five stacks. P–55. Therefore, although each member of the admissions committee reviewed more than one stack of files, no individual reviewed all the files in the discretionary zone.

28. Johanson testified that he had "rarely, if ever" vetoed a committee recommendation based on two or three votes, except in instances where an

administrative problem might make an individual ineligible for law school.

29. Johanson, in rebuttal testimony provided by deposition, testified, "[T]hose candidates who receive zero votes to admit, they're done. I don't even look at their files. Three people have said in comparison to our applicant pool they are not worthy of being admitted. They will—the next day they will get their denial. . . ." Johanson (by depo.), vol. 25 at 10 (emphasis added). This testimony contradicts the statement in the law school's "Statement of Policy on Affirmative Action," which states that all final decisions on each applicant file are made by Johanson. See D–362 at 4.

30. Both Johanson and Hamilton attended all the meetings; Aleman's attendance was not regular. Frequently, student members of the subcommittee attended the meetings, although they were not voting members of the subcommittee. Johanson, vol. 5 at 28–29.

dence reflected that the subcommittee shared general information about the minority pool of applicants with the full committee, the minority subcommittee's admission decisions on individual applicants were virtually final.[31]

## C. Admission Goals and Guidelines

The law school is the State's premier law school and is top-rated nationally. The cost of a legal education at the law school, a state-supported institution, is inexpensive in comparison to other schools of its caliber and, therefore, a bargain for the quality of education the law school's students receive. As a consequence, over 4000 applicants to law school each year compete for approximately 500 available seats.[32]

In selecting the entering class, the law school admissions committee has two specified requirements it must achieve. First, state law mandates the percentage of nonresidents that may be included in the entering class. In 1992, the law school was prohibited from having more than fifteen percent nonresidents in the entering class.[33] The other fixed figure to which the admissions committee must adhere has been set by the Board of Regents. This mandate requires the entering class to be composed of at least 500 students.

In addition to these established figures, the law school attempts to meet the targets established by the Office of Civil Rights through the Texas Plan of ten percent Mexican American students and five percent black

students in an entering class. *Johanson,* vol. 4 at 10. These numbers reflect an effort to achieve an entering class with levels of minority enrollment generally consistent with the percentages of black and Mexican American college graduates. The OCR figures, however, are aspirations only, subject to the quality of the pool of applicants. *Johanson,* vol. 4 at 9; *Goode,* vol. 9 at 12–13.

Personal interviews are not part of the law school's admission process.[34] Therefore, the law school must make its decision based on the information provided in the applicant's file, which, in addition to the application form and LSDAS material, may include a personal statement or letters of recommendation. The law school used the TI as an administrative tool to order candidates for review in the admissions process. However, the law school did not rely solely on the TI as the basis for admissions decisions but instead used it to create presumptions that could be overcome upon individual review of the files.[35] The importance of individual review stems from the fact that the applicants selected for admission come from a relatively narrow band within the full range of scores, and a difference of few points does not necessarily correlate with more successful work in law school. *Johanson,* vol. 3 at 11; *Stein,* vol. 18 at 15. Further, the TI does not adequately reflect the qualifications and characteristics a law school should consider in developing a diverse student body, which provides substantial educational benefit for all members of a law school class. *Brest,* vol. 22 at 14.

---

**31.** Johanson testified that, although a "particularly naughty problem" might be brought before the entire committee, almost all final decisions were made by the subcommittee. *Johanson,* vol. 5 at 29; *see also Johanson,* vol. 6 at 47.

**32.** The law school received 4,494 applications for the fall 1992 incoming class. It offered admission to 936 applicants to fill a class of slightly over 500 students. D–447 (Aff. of Rita Bohr at A–4). The overall median GPA for entering students was 3.52, and the overall median LSAT was 162 (89th percentile). D–433. The median figures for nonminorities were a GPA of 3.56 and an LSAT of 164 (93rd percentile); for blacks, a GPA of 3.30 and an LSAT of 158 (78th percentile); and for Mexican Americans, a GPA of 3.24 and an LSAT of 157 (75%). *Id.*

**33.** *Johanson,* vol. 4 at 9, 31. The percentage of nonresidents that may comprise an entering class has recently been increased to 20%. *Johanson,* vol. 4 at 46.

**34.** Nevertheless, Hamilton, as assistant dean of admissions responsible for recruiting the law school class, actively recruited minority students through "one-on-one" discussions and scholarship enticements. *Hamilton,* vol. 2 at 4–5, 9, 12–13.

**35.** The practice of using the GPA/LSAT index as a sorting mechanism is used by many nationally prominent law schools. *Brest,* vol. 22 at 13–14; *Stein,* Vol. 18 at 15; *Bollinger,* vol. 16 at 11–14; *Wegner depo.* at 9–10. However, none rely on the index as the sole basis for admission decisions. *Id.; see also* D–448.

### III. THE PLAINTIFFS

In 1992, Hopwood, Elliott, Carvell, and Rogers applied for admission to the law school. Hopwood is a white female; Elliott, Carvell, and Rogers are white males. None of the plaintiffs are Mexican American and all are residents of Texas.[36]

### A. Cheryl Hopwood

Cheryl Hopwood had a TI of 199, which placed her in the resident presumptive admit range. Hopwood's TI reflects a 3.8 grade point average and an LSAT score of 39.[37] Hopwood's application indicates she received an associate's degree in accounting from Montgomery County Community College in May 1984 and a bachelor's degree in accounting from California State University in Sacramento in 1988. The application further indicates she is a certified public accountant in California, she worked twenty to thirty hours a week while obtaining her undergraduate degree, and she was active in Big Brothers and Big Sisters in California. P–145. Hopwood submitted an additional letter to the law school dated January 22, 1992, requesting permission to attend law school on a limited basis the first year, if accepted, because of the needs of her child, who had been born with cerebral palsy.[38] Hopwood's application file contains no letters of recommendation.[39] Additionally, her responses to the questions are brief and do not elaborate on her background and skill. She provided no personal statement with the application.[40]

After his initial review of Hopwood's file, Johanson dropped her from the presumptive admission zone to the discretionary zone because, in his evaluation, she had not attended schools that were academically competitive with those of the majority of the applicants, had a large number of hours at junior colleges, and was able to maintain a high GPA although working a substantial number of hours.[41] Her file was subsequently reviewed by a three-member subcommittee of the admissions committee, which was comprised of Associate Dean Michael Sharlot, Dean Hamilton, and a law student. P–217 (Answer to int. 3). Because Hopwood received only one vote as result of the subcommittee review, the law school sent her a letter, dated April

36. The defendants contend that Hopwood should have been evaluated as a nonresident and, accordingly, would not have been in the presumptive admit range for nonresidents. However, Johanson testified that Hopwood did not misrepresent her status to the law school. She stated in her application she was married to a person in the military who was stationed in Texas at the time of her application. The law school treated her application as that of a resident throughout the process. *Johanson*, vol. 5 at 14. Further, Hopwood's residency classification was consistent with the law school's policies in effect at the time. *Id.; Johanson*, vol. 4 at 44–45; *Hopwood*, vol. 8 at 12–13.

37. Hopwood's LSAT score placed her in the 83rd percentile, well below the median LSAT for nonminorities in the 1992 entering class. P–145; D–433. Her two-digit TI was an 87, which correlates to 199 in the three-digit scoring system.

38. Hopwood testified that although her child was initially diagnosed with cerebral palsy, she has been found to have an extremely rare muscle disease and is severely handicapped. *Hopwood*, vol. 8 at 8–9. This information is not included in her admission file.

39. Hopwood testified that although she had been prepared to submit letters of recommendation, a person in the admissions office informed her

that, because of the large number of applications, the school did not have time to look at recommendations. *Hopwood*, vol. 8 at 6.

40. Hopwood testified that while in high school, she applied for college at Temple, Princeton, and Penn State and was offered admission at each school. However, because she had to pay for her own education and had to work her way through school, she could not afford to go to these schools. *Hopwood*, vol. 8 at 4. However, this information is not included in Hopwood's application despite the following statement on the application: "Please make any other comments about your college transcripts or your preparation for college (such as disadvantaged educational or economic background) that you believe will help the Admissions Committee in evaluating your application."

41. *Johanson*, vol. 5 at 14–17. Johanson believed that Hopwood's ability to work a significant number of hours while maintaining a high GPA was indicative of earning her GPA while on "a fairly slow track" at a non-competitive institution. *Id.* at 15–16. In contrast, Associate Dean Sharlot found that Hopwood's achievement of a high GPA while working was a "definite plus." D–334. This "plus," however, was insufficient to overcome Hopwood's below-median performance on the LSAT and attendance at a series of "very weak schools." *Id.*

8, 1992, offering her a place on the waiting list.[42]

The letter, which stated "[w]e regret that we cannot grant you admission to the 1992 entering class of the Law School at this time," instructed Hopwood to return the attached form to the law school within three weeks if she wished to be placed on the waiting list. P–145. The letter further instructed Hopwood not to put her name on the list if she would not be able to accept an offer of admission as late as August. Hopwood testified she subsequently called the law school admissions office and was told offers could be made from the waiting list through the first week of school. *Hopwood,* vol. 8 at 11–12. Hopwood did not put her name on the list because personnel in the law school's admissions office could provide no information regarding the likelihood of admittance from the list and Hopwood did not believe she would be in a position to make last minute arrangements for her special childcare needs if she were admitted either just before or in the first week of classes. *Hopwood,* vol. 8 at 12.

The Court finds that, under Hopwood's circumstances, she was effectively denied admission when she received the April 8 letter. Her failure to accept a position on the waiting list or to seek a deferral of admission until the following year, which information the Court notes is not included in the law school's April 8 letter to Hopwood, does not negate this fact.[43]

## B. Kenneth Elliott

Kenneth Elliott applied with a TI of 197, representing a GPA of 2.98 and an LSAT score of 167. Elliott's application indicates he received a B.B.A. in accounting from the University of Texas in 1984, is a certified public accountant, and has worked as an auditor or examiner for state agencies since receiving his undergraduate degree. P–153. In addition to his personal statement, Elliott's file contains two letters of recommendation from employment supervisors.

In the discretionary zone of nonminority applicants, Elliott's file was reviewed by a subcommittee of three that included Johanson. D–332 at A–33. Elliott received no votes, and the law school sent him a denial letter dated April 11, 1992. P–153. In July 1992, Elliott's father wrote a letter to Dean Mark Yudof in which he requested that Elliott's application for admission be reconsidered. P–165. Elliott's father further stated that Elliott did not know he was writing the letter and that Elliott's "friends and family all feel that he was not accepted to U.T. because of limited openings at U.T. due to mandatory minority and women quotas which use a large percentage of the openings."[44] The dean referred the letter to Hamilton, who informed Elliott's father that although she was not at liberty to discuss Elliott's application, she would pursue the matter with Elliott if Elliott felt he had been treated unfairly. *Hamilton,* vol. 2 at 67. Hamilton testified she telephoned Elliott, told him she had received a letter on his behalf, and invited him to come to her office to visit. *Id.* at 67–68. Hamilton testified Elliott canceled the first appointment and she scheduled a second appointment, which she canceled. Hamilton testified she subsequently called him back and told him she was placing him on the waiting list.[45] Elliott, however, testi-

---

**42.** Hopwood received one vote from Hamilton, who was also a member of the minority subcommittee. P–217 (Answer to int. 4); D–333 at A–37.

**43.** The Court notes that during 1992, individuals were offered admission from the waiting list. Of the 332 applicants offered a position on the waiting list in 1992, 75 were admitted. D–447 (Aff. of Rita Bohr at A–5). Hamilton testified that as late as the first week of classes, seven persons were admitted from the waiting list. Hamilton, vol. 2 at 65–67. However, the Court also notes from the affidavits of Johanson and Hamilton that Hopwood had little likelihood of acceptance from a waiting list. In fact, Hamilton specifically stated, "It is my belief that Ms. Hopwood [would] not have been admitted off the waiting list at a later time." D–333 at A–39.

**44.** P–165. The only copy of the letter in the record is an unsigned draft provided by the plaintiffs. Hamilton testified that the letter actually received by the law school had been administratively misplaced since the summer of 1992. *Hamilton,* vol. 2 at 68–69.

**45.** *Id.* Johanson testified it was "quite unusual" for someone to be reconsidered and placed on the waiting list without Johanson's awareness of

fied he had no further conversations with anyone at the law school after the failed meetings and did not know he had been placed on the waiting list. *Elliott,* vol. 7 at 21.

Hamilton testified that on August 24, she decided to grant Elliott an offer of admission, left a message on his answering machine, and instructed admissions personnel to continue to try to reach him. *Hamilton,* vol. 2 at 58–59. Hamilton stated that approximately a week later, after classes had begun, Elliott returned her call but indicated it was impossible for him to attend school at that time. *Id.* at 59–60. However, in Hamilton's affidavit, submitted to this Court as part of the pretrial motions, Hamilton stated that Elliott never responded to her phone calls. D–447 (Supp.Decl. of Hamilton at 3). Further, Elliott's file contains no letters either notifying him of his placement on the waiting list or his admission to school, despite the existence of such documentation for others offered admission from the waiting list late in the process.

The Court finds that Elliott had to have realized, at minimum, his application was under reconsideration when an assistant dean initially contacted him. However, being offered a position on the waiting list, as the Court has already found, is not equivalent to admission. To determine whether Elliott actually received an offer of admission, the Court must evaluate the conflicting testimony of Elliott and Hamilton. The discrepancies in Hamilton's affidavit and trial testimony, as well as the law school's lack of documentation of Elliott's status, weigh in Elliott's favor.[46] Accordingly, the Court finds that Elliott was not notified of his admission to law school.

In 1992, Elliott also applied to Baylor School of Law and Texas Tech School of Law. He was denied admission to Baylor.

Although accepted at Texas Tech, a state university, Elliott declined the offer of admission by letter dated June 2, 1992. *See* D–401.

## C. Douglas Carvell

Douglas Carvell had a TI of 197, which was based on an undergraduate GPA of 3.28 and an average LSAT score in the 76th percentile.[47] His application reflects that in 1991 he received his B.A. in political science from Hendrix College in Conway, Arizona. P–151. The LSDAS report indicates Carvell ranked 98th in his class of 247 at Hendrix College. P–151; D–336 at A–49. Carvell provided detailed responses to the application questions on typewritten attachments to his application. Carvell's file included three letters of recommendation, one from a professor at Hendrix College that compliments his intellectual abilities but describes his performance as uneven, disappointing, and mediocre. P–151.

Because Carvell's TI placed him in the nonminority discretionary zone, his file was reviewed by a subcommittee of three. He received no votes from the two faculty members on the subcommittee, Professors Steven Goode and Mark Gergen, but did get one favorable vote from a student member of the committee. *See* D–335, D–336. Therefore, by letter dated April 15, 1992, the law school offered him a position on the waiting list, which he accepted. While he was on the waiting list, Carvell's file was reviewed by Associate Dean Michael Sharlot, a member of the admissions committee. Sharlot did not vote to admit Carvell from the waiting list. D–334 at A–43–A–44. By letter dated July 16, 1992, the law school denied Carvell admission. P–151.

In addition to the law school, Carvell applied for admission to Southern Methodist University School of Law and Vanderbilt

---

the decision. *Johanson,* vol. 5 at 19–21. He testified he knew nothing about Elliott being placed on the waiting list. *Id.*

**46.** The Court is not implying that Hamilton testified in an untruthful manner. However, because of the number of applicant files Hamilton was required to address and the time pressures under which she was working as the beginning of the

school year approached, the Court believes it very possible her recall of the chronology of specific events may be inaccurate.

**47.** Carvell's application reflects that he took the LSAT twice, receiving a score of 34 (61st percentile) the first time and a score of 164 (91st percentile) the second time. The LSAT factored in his TI is an average of these two scores.

School of Law. He was denied admission to Vanderbilt, but was accepted at SMU, where he has completed his first year of law school. *Carvell*, vol. 10 at 6–7. Carvell also applied to the University of Texas School of Business and was denied admission. *Id.* at 12. At SMU, Carvell is pursuing a master's of business administration in a joint program with the SMU law school. *Id.* at 6.

## D. David Rogers

David Rogers had a TI of 197 based on his undergraduate GPA of 3.13 and an LSAT score of 166. In the early to mid–1980s, Rogers attended the University of Texas as a student in Plan II, an honors program. However, in 1985, he was dismissed because of his poor scholastic performance. *Rogers*, vol. 11 at 55. Rogers subsequently attended the University of Houston–Downtown and received an undergraduate degree in professional writing in 1990. P–171; *Rogers*, vol. 11 at 56. In 1992, Rogers received an advanced degree in professional writing from the University of Southern California. P–171. Rogers noted on his law school application that "as a white who attended an all-minority school for several years, and who was raised by a single mother, I have an unusual understanding of the challenges faced by women and minorities." P–171. Rogers's application file contains no letters of recommendation. P–171; *see also* D–335 at A–46–A–47.

Rogers received no votes from any member of the subcommittee that reviewed his file in the nonminority discretionary zone. By letter dated April 7, 1992, he was denied admission to the law school. P–171.

## IV. DISCUSSION

### A. Ripeness and Standing

As a preliminary matter, the defendants contest the ripeness of two of the plaintiffs' claims and the standing of all plaintiffs to bring this cause of action.[48] With regard to Hopwood and Elliott, the defendants argue their claims are not ripe because neither was denied admission.[49] As stated above, the Court has found both Hopwood and Elliott were, in effect, denied admission to the law school. Therefore, a ripe controversy exists between these two plaintiffs and the defendants.

The defendants contend Hopwood lacked standing to challenge the admissions policy because she failed to accept a position on the waiting list or to ask for deferred admission. Therefore, according to the defendants, she has failed to exhaust the administrative procedures available to her. The defendants further contend all plaintiffs lack standing in that none can show they would have been granted admission absent the challenged admissions policies.[50]

To have standing to challenge a governmental action, a plaintiff must demonstrate a concrete "injury in fact," a causal relationship between the injury and the challenged conduct, and a likelihood the injury will be redressed by a favorable decision. *Northeastern Fla. Contractors v. City of Jacksonville*, —— U.S. ——, —— – ——, 113 S.Ct. 2297, 2301–02, 124 L.Ed.2d 586 (1993). However, the "injury in fact" in an equal protection case involving a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group is the denial of the equal treatment and not the ultimate inability to obtain the benefit. *Id.* at ——, 113 S.Ct. at 2303.

The defendants assert this exception to requiring plaintiffs to show a direct causal relationship is limited in its application to challenges to the validity of express set-asides or reservations such as those addressed in *City of Jacksonville* and *Bakke*. The Court does not read the requirements for standing set forth in *City of Jacksonville*

---

48. This matter was addressed at length in pretrial motions and hearings, and the transcripts and evidence related to those motions are evidence in this cause.

49. As discussed above, the defendants claim Hopwood voluntarily removed herself from the admissions process and Elliott was offered admission.

50. With regard to Elliott, the defendants contend he lacks standing to challenge the initial decision to deny him admission.

to be limited in the manner defendants contend. In defining standing as applied in equal protection cases, the Supreme Court reviewed its precedent on the issue. The overarching proposition of the cases the Supreme Court cited in reaching its holding was not that the causal-connection exception applied only to specific set-asides, but that an "injury in fact" stemmed from any governmental barrier that either created a discriminatory obstacle or had the effect of producing unequal access to a governmental benefit.[51] Accordingly, the Court finds all the plaintiffs have standing—they have sufficiently alleged that the law school's admission process is the cause of their injury and that a judicial order could redress the injury.[52]

### B. Standard of Review

■ Affirmative action plans based on race trigger strict judicial scrutiny. *City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 493, 109 S.Ct. 706, 721, 102 L.Ed.2d 854 (1989); *see also Bakke,* 438 U.S. at 291, 98 S.Ct. at 2748 (Powell, J.) ("Racial and ethnic distinctions of any sort are inherently suspect and thus call for the most exacting judicial examination."). Further, "the level of scrutiny does not change merely because the challenged classification operates against a group that historically has not been subject to governmental discrimination." *Wygant v. Jackson Bd. of Educ.,* 476 U.S. 267, 273, 106 S.Ct. 1842, 1846, 90 L.Ed.2d 260 (1986); *see also Croson,* 488 U.S. at 494, 109 S.Ct. at 722 (reaffirming equal protection analysis is not

dependent on the race of those burdened or benefited by a classification).

The defendants contend, however, strict scrutiny is inappropriate in this cause in light of the Supreme Court's holding in *Metro Broadcasting v. FCC,* 497 U.S. 547, 110 S.Ct. 2997, 111 L.Ed.2d 445 (1990). In *Metro Broadcasting,* the Supreme Court held that affirmative action plans adopted pursuant to federal mandates are subject to intermediate scrutiny—a determination whether the plans serve important governmental objectives and whether they are substantially related to the achievement of the objectives. *Id.* at 565, 110 S.Ct. at 3009. The defendants contend that the Texas Plans equate to a federal mandate because they stem from the OCR's insistence on full compliance with Title VI, an objective that is within the power of Congress.[53]

■ The Court finds the argument unpersuasive. In *Metro,* the FCC's minority ownership programs had been specifically mandated and approved by Congress. *Id.* at 563, 110 S.Ct. at 3008. While it is true that Congress has the power to identify and redress the effects of discrimination and has charged the DOE with assuring compliance with Title VI, there is no similar congressional mandate in this cause. Further, the FCC is a licensing body that, pursuant to a congressional mandate, established specific minority ownership policies. The OCR has provided Texas with a number of suggested tools Texas may implement to bring the higher educational system into compliance with Title VI; it has not, however, required

---

51. *See id.* —— U.S. at ——–——, 113 S.Ct. at 2302–03 (discussing *Clements v. Fashing,* 457 U.S. 957, 102 S.Ct. 2836, 73 L.Ed.2d 508 (1982); *Bakke,* 438 U.S. 265, 98 S.Ct. 2733 (1978); and *Turner v. Fouche,* 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970)).

52. Further, the law school's 1992 procedure for review of applicants in the discretionary zone effectively prevents any nonminority candidate from establishing that he or she would have been admitted but for the preference given to minority applicants. *See infra* note 86.

53. The defendants also contend a suit against the State of Texas or the University of Texas is an impermissible collateral attack on OCR programs and regulations and, in support of this proposition, cite *Milwaukee County Pavers Ass'n*

*v. Fiedler,* 922 F.2d 419 (7th Cir.), *cert. denied,* 500 U.S. 954, 111 S.Ct. 2261, 114 L.Ed.2d 714 (1991). However, in this cause the plaintiffs are not attempting to challenge a federal statute creating minority business set-asides by challenging the State's role in the program. Instead, the plaintiffs in this cause are challenging the specific procedure the law school voluntarily designed and implemented to achieve affirmative action goals suggested by OCR. The constitutionality of the law school's procedure is not dependent on whether the OCR can require affirmative remedies for a Title VI violation. *See Podberesky v. Kirwan,* 764 F.Supp. 364, 374 (D.Md.1991), *rev'd and remanded,* 956 F.2d 52 (4th Cir.1992), *on remand,* 838 F.Supp. 1075 (D.Md.1993).

the State to adopt any specific procedures. Although the defendants characterize the law school's efforts as pursuant to an OCR "consent decree," the evidence reflects that, to date, the State of Texas' efforts to comply with Title VI have been made voluntarily in an effort to avoid a specific mandate or the loss of federal funding. *Ashworth,* vol. 13 at 34, 39.

Further, under equal protection analysis, the same level of scrutiny applies to race-conscious affirmative action plans adopted pursuant to consent agreements as to other voluntarily adopted plans. *See, e.g., In re Birmingham Reverse Discrimination Employment Litig.,* 833 F.2d 1492, 1501 (11th Cir.1987), *aff'd sub nom. Martin v. Wilks,* 490 U.S. 755, 109 S.Ct. 2180, 104 L.Ed.2d 835 (1989) (Title VII consent decree). Indeed, the most recent circuit court opinion analyzing an affirmative action plan in the education context, specifically a scholarship plan adopted in response to protracted litigation and OCR guidelines, upheld the lower court's application of strict scrutiny as the proper standard for review of the plan. *See Podberesky v. Kirwan,* 956 F.2d 52, 55 (4th Cir.1992).

The most compelling justification for application of strict scrutiny in this context is to provide assurance that individual rights are afforded the full protection they merit under the Constitution. Only by applying strict scrutiny can a court honestly weigh the validity and necessity of efforts to remedy past wrongs against the rights of otherwise qualified nonminorities affected by the efforts. Although the use of racial classifications is disfavored, there are instances when such classifications serving proper purposes should be upheld. Only through diligent judicial examination can a court determine if a classification is consistent with constitutional

guarantees and not related to "illegitimate notions of racial inferiority or simple racial politics." *Croson,* 488 U.S. at 493, 109 S.Ct. at 721. Accordingly, the Court concludes the law school admissions process must be subjected to a strict scrutiny test under the Equal Protection Clause of the Fourteenth Amendment to protect both the integrity of the process and the important individual rights at issue.[54]

### C. Application of Strict Scrutiny

Strict judicial scrutiny involves a determination of whether the law school process served "a compelling governmental interest" and whether the process is "narrowly tailored to the achievement of that goal." *See Wygant v. Jackson Bd. of Educ.,* 476 U.S. 267, 274, 106 S.Ct. 1842, 1847, 90 L.Ed.2d 260 (1986). The purpose of ascertaining whether a compelling governmental interest exists is to "smoke out" illegitimate uses of race by ensuring that the goal is important enough to use the suspect tool of racial preference. *Croson,* 488 U.S. at 493, 109 S.Ct. at 721. The narrowly tailored analysis "ensures that the means chosen 'fit' this compelling goal so closely that there is little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype." *Id.*

*1. Compelling Governmental Interest.*—Both sides expended considerable time and effort at trial on the issue of whether a compelling governmental interest existed sufficient to justify the need for the law school's affirmative action program. The defendants offered a number of reasons as justification for the law school's affirmative action program. These reasons are set forth in the law school's "Statement of Policy on Affirmative Action":[55]

---

**54.** As an additional point, even if the Court were to find intermediate scrutiny to be the proper standard of review, the Court would still be required to assess whether the process imposed undue burdens on nonminorities. *See Metro Broadcasting,* 497 U.S. at 596–97, 110 S.Ct. at 3026 ("[A] congressionally mandated benign race-conscious program that is substantially related to the achievement of an important governmental interest is consistent with equal protection principles so long as it does not impose *undue* burdens on nonminorities."). As dis-

cussed *infra* pp. 575–579, the burden imposed upon nonminorities by the law school's admissions procedure is a very troubling aspect of the process and, ultimately, in this Court's view, renders the process constitutionally impermissible.

**55.** This written articulation of the purposes and policy of the law school's affirmative action program and description of the 1992 process was prepared in February 1994. *Johanson,* vol. 6 at 45–46; *Yudof,* vol. 20 at 30–31.

To achieve the School of Law's mission of providing a first class legal education to future leaders of the bench and bar of the state by offering real opportunities for admission to members of the two largest minority groups in Texas, Mexican Americans and African Americans;

To achieve the diversity of background and experience in its student population essential to prepare students for the real world functioning of the law in our diverse nation;

To assist in redressing the decades of educational discrimination to which African Americans and Mexican Americans have been subjected in the public school systems of the State of Texas;

To achieve compliance with the 1983 consent decree entered with the Office of Civil Rights of the Department of Education imposing specific requirement for increased efforts to recruit African American and Mexican American students;

To achieve compliance with the American Bar Association and the American Association of Law Schools standards of commitment to pluralist diversity in the law school's student population.

D–362. Although all are important and laudable goals, the law school's efforts, to be consistent with the Equal Protection Clause, must be limited to seeking the educational benefits that flow from having a diverse student body and to addressing the present effects of past discriminatory practices. *See Bakke,* 438 U.S. at 313; 98 S.Ct. at 2760 (environment fostering robust exchange of ideas makes goal of diversity "of paramount importance in the fulfillment of [a university's] mission"); *United States v. Paradise,* 480 U.S. 149, 167, 107 S.Ct. 1053, 1064, 94 L.Ed.2d 203 (1987) ("The government unquestionably has a compelling interest in remedying past and present discrimination by a state actor."); *Podberesky,* 956 F.2d at 57 (race-related remedy may be used in attempt to remedy effects of past discrimination). Accordingly, the Court will evaluate the program in light of these goals.[56]

The plaintiffs do not dispute that under the holding of *Bakke,* obtaining the benefits that flow from a racially and ethnically diverse student body is a compelling interest justifying the use of racial preferences.[57] Nevertheless, the plaintiffs suggest that under more recent Supreme Court decisions, the only compelling interest recognized for race-conscious programs is remedying the past effects of racial discrimination.[58] However, none of the recent opinions is factually based in the education context and, therefore, none focuses on the unique role of education in our society.[59] Absent an explicit statement from the Supreme Court overruling *Bakke,* this

**56.** Notwithstanding the personal views of this judge, it appears the goal of increasing the number of minority members in the legal profession and judiciary of Texas is not a legally sufficient reason to justify racial preferences under fourteenth amendment analysis. *See Croson,* 488 U.S. at 496–98, 109 S.Ct. at 723–24. Further, the desires and goals of a private entity such as the ABA or AALS, though important considerations for an accredited law school, do not provide sufficient justification for racial classifications. Similarly, Texas' "consent decree" with the OCR, though having evidentiary value in terms of past discrimination in Texas' higher education system, is not, in and of itself, a valid justification.

**57.** The plaintiffs do contend the law school's affirmative action program is not narrowly tailored to meet the objective of diversity, an issue the Court will address below.

**58.** In support of this proposition, the defendants cite *Croson,* 488 U.S. at 493, 109 S.Ct. at 722 ("Unless [racial classifications] are strictly reserved for remedial settings, they may in fact promote notions of racial inferiority and lead to politics of racial hostility."), and dissenting opinions from *Metro Broadcasting* and *Johnson v. Transportation Agency, Santa Clara, California. See Metro Broadcasting,* 497 U.S. at 613–15, 110 S.Ct. at 3035 (O'Connor, J., dissenting); *Johnson,* 480 U.S. 616, 673–75, 107 S.Ct. 1442, 1473–1474, 94 L.Ed.2d 615 (Scalia, J., dissenting).

**59.** The Supreme Court recognized the vital role education plays in our society in *Brown v. Board of Education:*

[Education] is the very foundation of good citizenship. Today it is a principal instrument for awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment. In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education.

*Brown v. Board of Educ.,* 347 U.S. 483, 493, 74 S.Ct. 686, 691, 98 L.Ed. 873 (1954).

Court finds, in the context of the law school's admissions process, obtaining the educational benefits that flow from a racially and ethnically diverse student body remains a sufficiently compelling interest to support the use of racial classifications.

The defendants presented evidence, which included the testimony of deans from law schools across the country and the testimony of former and current law students, that the benefit to the law school educational experience derived from a diverse student population is substantial. *See, e.g., Brest,* vol. 22 at 22–23; *Stein,* vol. 18 at 20–21; *Bollinger,* vol. 16 at 23–26; *Spector,* vol. 15 at 9–10. Additionally, several professors testified regarding the educational benefit of having a diverse group of students in the classroom setting. *See, e.g., Goode,* vol. 9 at 20–21; *Yudof,* vol. 21 at 59–60. According to the evidence presented at trial, without affirmative action the law school would not be able to achieve this goal of diversity. Had the law school based its 1992 admissions solely on the applicants' TIs without regard to race or ethnicity, the entering class would have included, at most, nine blacks and eighteen Mexican Americans.[60]

Although under current law the goal of diversity is sufficient by itself to satisfy the compelling governmental interest element of strict scrutiny, the objective of overcoming past effects of discrimination is an equally important goal of the law school's affirmative action program. The plaintiffs have asserted that any past discrimination against blacks occurred so long ago, it has no present effects and that the law school has never discriminated against Mexican Americans.[61] The plaintiffs further assert the Court should limit its review of past discrimination to official acts and policy of the University of Texas law school and should not consider discrimination in Texas' educational system as a

whole. As support for this contention the plaintiffs cite *Croson,* in which the Supreme Court struck down a city set-aside program that required thirty percent of city contracts to be subcontracted to minority businesses. 488 U.S. at 499, 109 S.Ct. at 724 ("Like the claim that discrimination in primary and secondary school justifies a rigid racial preference in medical school admissions, an amorphous claim that there has been past discrimination in a particular industry cannot justify the use of an unyielding racial quota.").

Recently, however, the Supreme Court held that a system of higher education is under an affirmative duty to eliminate every vestige of racial segregation and discrimination in its educational system and to *reform those policies and practices that required or contributed to separation of the races.* *United States v. Fordice,* —— U.S. ——, ——, 112 S.Ct. 2727, 2743, 120 L.Ed.2d 575 (1992). Thus, it appears the Supreme Court has recognized that the restrictions it has applied in ascertaining the present effects of past discrimination in the employment context, specifically the prohibition against remedying effects of "societal discrimination" and discrimination implemented by another governmental unit, are not appropriate in the education context. *See also Podberesky v. Kirwan,* 838 F.Supp. 1075, 1098 & n. 79 (D.Md. 1993). "Applicants do not arrive at the admissions office of a professional school in a vacuum," and, in fact, have ordinarily been students in an educational system for sixteen years. *Geier v. Alexander,* 801 F.2d 799, 809 (6th Cir.1986). The Court believes, therefore, the residual effects of past discrimination in a particular component of a state's educational system must be analyzed in the context of the state's educational system as a whole. The State's institutions of higher education are inextricably linked to the primary and secondary schools in the system. Ac-

---

**60.** D–441. The Court believes such meager representation would be woefully inadequate in a state university supported, in part, by revenues from *all* state residents. Further, the Court concurs with the defendants that diversity requires more than token representation of minorities; strict reliance on the TIs for admission would not further the goal of diversity.

**61.** The plaintiffs' expert, James Armor, a senior fellow at the Institute of Public Policy, George Mason University, in Fairfax, Virginia, testified there are no present direct effects of past discrimination in Texas' educational system. *Armor,* vol. 10 at 45–48. Armor testified the only cities in Texas he has visited are Dallas and Houston. *Armor,* vol. 11 at 41. The Court does not find Armor to be a credible witness.

cordingly, this Court has not limited its review to the law school or Texas' higher education system in evaluating the present effects of past discrimination.[62] However, were the Court to limit its review to the University of Texas, the Court would still find a "strong evidentiary basis for concluding that remedial action is necessary." *Podberesky v. Kirwan,* 956 F.2d at 55.

As discussed above, Texas' long history of discrimination against blacks and Mexican Americans in public education is chronicled in court opinions, the findings of the OCR, and the continuing desegregation suits against the State.[63] The State of Texas engaged in overt discrimination against blacks until the practices were forcibly dismantled in the relatively recent past. Discrimination in education was at the center of official discrimination against black Texans. Additionally, the University of Texas has a history of racial discrimination.

Similarly, the State has subjected Mexican Americans to discriminatory practices in the education area as reflected in the findings of unlawful *de jure* discrimination in the numerous desegregation lawsuits. Less documentation exists of overt official discrimination against Mexican Americans than against blacks at the University of Texas. However, the legacy of Texas' discriminatory practices continues to hinder the University of Texas' efforts to attract qualified Mexican American students.

In recent history, there is no evidence of overt officially sanctioned discrimination at the University of Texas. The evidence reflects that the university has made genuine efforts in the last decade to end discrimination by recruiting and maintaining minority faculty members and students and condemn-

ing racial incidents occurring on campus or involving student organizations. Despite these efforts, however, the legacy of the past has left residual effects that persist into the present. The evidence presented at trial indicates those effects include the law school's lingering reputation in the minority community, particularly with prospective students, as a "white" school; an underrepresentation of minorities in the student body; and some perception that the law school is a hostile environment for minorities.

The university's efforts to recruit minorities has led to a modest increase in the number of minorities attending the law school. However, admissions and recruitment personnel face difficulties in attracting qualified minorities to enroll in the law school. These difficulties stem from negative perceptions of the racial climate at the law school as a result of past discrimination.[64] Because of the law school's legacy of discrimination, it must overcome a perception that it is a "white institution." *Wright,* vol. 19 at 33–34. Recent racial incidents, although not officially sanctioned by the school, have reinforced the perception that the university is hostile to minorities and has hurt its ability to recruit minority students. *Wright,* vol. 19 at 29–31. An affirmative action program is therefore necessary to recruit minority students because of the past discrimination.

The effects of the State's past *de jure* segregation in the educational system are reflected in the low enrollment of minorities in professional schools, including the law school. The OCR findings and the OCR's continuing review of Texas' efforts to desegregate demonstrate the pervasive nature of past discrimination in the higher education

**62.** *See also Ayers v. Allain,* 893 F.2d 732, 751 (5th Cir.1990):

Brown states that the stigmatizing effects of segregation are not created by legally compelled attendance but rather from the vestiges of legally compelled separation. Thus the lesson of *Brown* is that the malignancy of apartheid does not vanish in state-sponsored forums simply because attendance is voluntary and admittance race-neutral.

**63.** *See, e.g., League of United Latin Am. Citizens v. Clements,* 999 F.2d 831, 866 (5th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 878, 127 L.Ed.2d

74 (1994) ("Texas' long history of discrimination against its black and Hispanic citizens in all areas of public life is not the subject of dispute....").

**64.** *Hamilton,* vol. 2 at 49–50, 52–53; *Wright,* vol. 19 at 33–36. *Sweatt v. Painter* is often studied in undergraduate courses and contributes to undergraduate minorities' perception of the University of Texas as an institution that does not welcome minorities. *Wright,* vol. 19 at 33–36; *Romo,* vol. 17 at 64.

system.[65] As a result of policies of official discrimination in the Texas higher education system, a generation of blacks and Mexican Americans who are the parents of those presently of law school age were denied meaningful opportunities for higher education. *Glenn,* vol. 23 at 51–53; *Romo,* vol. 17 at 63–64; *Wright,* vol. 19 at 45–47. The denial of these opportunities to the generation of minority parents bears a causal connection to the diminished educational attainment of the present generation. *Glenn,* vol. 23 at 51–52; *Romo,* vol. 17 at 53–54.

Further, many public schools in Texas continued to have a substantial degree of racial and ethnic segregation during the 1970s and 1980s, the decades in which the majority of 1992 law school applicants attended primary and secondary schools. *Glenn,* vol. 23 at 48–51; D–379. This segregation has handicapped the educational achievement of many minorities. The ultimate effect of the inferior educational opportunity, combined with the lower socioeconomic status of minorities in Texas, is a disproportionately smaller pool of minority applicants to law school. D–379 at 6–7; *see also supra* note 3.

In addition, some minority students enrolled in the law school feel isolated even with the current commitment to affirmative action and diversity and are often hesitant to participate in class discussion when they are the sole minority or one of a few minorities in a class. *Longoria,* vol. 15 at 32–34; *Rodriguez,* vol. 17 at 24–25. Some minority students continue to perceive a hostile racial environment on the campus, which they assert is reflected in insensitive comments by fellow students and faculty. *Bell,* vol. 14 at 16, 29–34; *Escobedo,* vol. 14 at 41–42; *Longoria,* vol. 15 at 32–24.

Accordingly, despite the plaintiff's protestations to the contrary, the record provides strong evidence of some present effects at the law school of past discrimination in both the University of Texas system and the Texas educational system as a whole. Therefore, the Court finds the remedial purpose of the law school's affirmative action program is a compelling governmental objective.

*2. Narrowly Tailored.*—The Court must next decide if the admissions process was narrowly tailored to achieve the goals of diversity and overcoming the present effects of past discrimination. This determination requires the application of four factors: the efficacy of alternative remedies; the flexibility and duration of the relief; the relationship of the numerical goals to the percentage of minorities in the relevant population; and the impact of the relief on the rights of third parties. *See United States v. Paradise,* 480 U.S. 149, 171, 107 S.Ct. 1053, 1066, 94 L.Ed.2d 203 (1987).

The defendants have shown it is not possible to achieve a diverse student body without an affirmative action program that seeks to admit and enroll minority candidates. *Brest,* vol. 22, at 15. As stated above, in 1992, the entering class would have included at most nine blacks and eighteen Mexican Americans, had the review of minorities been limited to those applicants in the presumptive admit and discretionary zones for white applicants. D–441; *Yudof,* vol. 21 at 44; *Johanson,* vol. 6 at 38. These numbers reflect the maximum potential and assume no adverse affect on the number of applicants stemming from the abandonment of affirmative action.

Further, the record indicates the ultimate effect of abandoning affirmative action at the law school would be to redirect minorities to the historically separate state law school at Texas Southern University, thereby resegregating the law school.[66] Alternatives, such as minority scholarships and increased mi-

---

**65.** The plaintiffs contend the OCR's findings are invalid because the OCR did not apply the standards recently set forth by the Supreme Court in *Fordice.* However, neither the validity of the OCR investigation, nor the retroactive application of *Fordice* is the issue before this Court.

**66.** *Ashworth,* vol. 12 at 44–45; D–432; D–453; D–454. In 1971, the year following the Board of Regents disapproval of the law school's participation in the CLEO program, the law school

entering class had no blacks. As late as 1974 only ten of the law school's 1600 students were black. *Wright,* vol. 19 at 31–33. Texas Southern University, the law school Texas created to avoid integration of the law school, enrolls almost 50% of all entering minority law students in Texas. This percentage would increase dramatically in the absence of the law school's affirmative action program. *Wright,* vol. 19 at 21–22; *Ashworth,* vol. 12 at 44–45; D–432; D–452; D–453.

nority recruitment, while effective tools in conjunction with the affirmative action program, would not be effective means by themselves to meet the compelling governmental interests of true diversity and remedying the effect of past *de jure* segregation. In fact, the record in this case demonstrates that, without affirmative action, the perception of the law school as a "white" institution would be exacerbated, which would compound the difficulties of attracting top minority students. *Wright,* vol. 19 at 36–37; *Goode,* vol. 9 at 19; *Rodriguez,* vol. 17 at 25.

The evidence shows that despite genuine efforts to end discrimination, the legacy of the past continues to hinder the law school's efforts to attract highly qualified minority students. Accordingly, the Court finds affirmative action in the law school's admissions program is an effective and necessary means to overcome the legacy of the past and to achieve the diversity necessary for a first-class university.

■ The plaintiffs argue the admissions program establishes the functional equivalent of an impermissible quota system in which the law school attempts to camouflage quotas through the use of the term "goals." The plaintiffs contend because the admissions committee knows the approximate number of students in an incoming class, the five percent black and ten percent Mexican American figures translate into specific numbers.

The admissions data from the past ten years shows variations in the admission figures for the two groups receiving admissions preferences at the law school—blacks and Mexican Americans. The data reflects that between 1983 and 1993, the percentage of black admissions varied from a low of 3.2 percent, occurring in 1987, to a high of 9.3

percent in 1983. The percentage in 1992 was 8.0 percent. Mexican American admissions varied from a low of 10 percent, occurring in both 1983 and 1993, and a high of 14.3 percent occurring in 1984. The percentage in 1992 was 10.7.[67]

An illegal quota, as defined by the Supreme Court, exists when a fixed number of seats are set aside or an unyielding number is set to achieve a goal. *See Bakke,* 438 U.S. at 288, 98 S.Ct. at 2747 (defining quota as fixed number of seats set aside); *see also Metro Broadcasting,* 497 U.S. at 599, 110 S.Ct. at 3027 (equating quota with a "fixed quantity set aside"); *Croson,* 488 U.S. at 499, 109 S.Ct. at 724–25 (describing thirty percent minority set-aside as rigid and unyielding quota); *Fullilove v. Klutznick,* 448 U.S. 448, 498, 100 S.Ct. 2758, 2785, 65 L.Ed.2d 902 (1980) (equating quota with set-aside). Though it is evident from the admissions figures that the percentages of desired minorities in a class derived from the OCR investigation served as guidelines, the law school did not rigidly and inflexibly apply the numbers. Instead, the percentages fluctuate randomly, albeit within a relatively narrow range, and show no consistent pattern of increase. In some years, the law school has failed to meet its goals because of the relatively weak strength of the minority applicant pool. *Goode,* vol. 9 at 13–17. No evidence was presented at trial that the law school granted a set-aside for any particular group or that competition for any specific seat in the class was closed to some students because of race or ethnicity.[68] Accordingly, the Court finds the 1992 admissions process did not use an illegal quota but was, in fact, flexible in achieving its goals based on the strength of the minority applicant pool.

67. The admissions data from 1983 to 1993 reflects the following minority admissions, both in percentages and actual numbers of students:

| Year | Black | Mexican American |
|------|-------|------------------|
| 1983 | 9.3 (47) | 10.0 (51) |
| 1984 | 6.2 (32) | 14.3 (74) |
| 1985 | 4.6 (25) | 11.2 (61) |
| 1986 | 4.4 (24) | 13.1 (71) |
| 1987 | 3.2 (17) | 10.2 (55) |
| 1988 | 7.0 (44) | 10.7 (60) |
| 1989 | 6.0 (35) | 11.4 (58) |
| 1990 | 7.1 (39) | 11.6 (64) |
| 1991 | 6.9 (35) | 10.6 (54) |
| 1992 | 8.0 (41) | 10.7 (55) |
| 1993 | 5.9 (31) | 10.0 (53) |

D–71.

68. The law school maintains racially segregated "wait lists," which the plaintiffs contend the law school uses to adjust the racial composition of the incoming class to meet its goals. However, the evidence at trial showed that there is no "last seat," as in *Bakke,* for which an applicant's race is the deciding factor. *See, e.g., Johanson,* vol. 4 at 43.

As for duration, the law school has not stated precisely how long it envisions maintaining its affirmative action admissions program. However, in the 1990s, as the minority applicant pool improved, the admissions committee made the decision not to admit greater numbers of minority students but to attempt to close the gap in credentials of minority and nonminority students. *Wellborn*, vol. 24 at 31–35; *Goode*, vol. 9 at 7, 17–18. Therefore, in 1992, despite a significant increase in the number of minority applicants from the previous years, the law school's minority admissions remained relatively stable. *Johanson*, vol. 6 at 13–14; P–47; D–438; D–439.

The current objective of the law school, as articulated at trial, is to continue to narrow the gap to the point where affirmative action will not be required to achieve a representative percentage of minorities in the entering classes.[69] The evidence reflects that the law school admissions committee regularly reviews and adjusts the remedy to evaluate its necessity and efficacy.[70] Certainly, an indefinite program would violate the Equal Protection Clause. However, the law school's use of the program until the OCR has determined Texas is in compliance with Title VI and until the gap in minority and nonminority credentials has narrowed such that the State will remain in compliance with Title VI without the need for affirmative action does not offend the Constitution. *See Podberesky*, 764 F.Supp. at 376.

The third factor, the relationship of the numerical goals to the relevant population, is easily satisfied under these facts. The law school has not attempted to set goals that reflect the percentage of minorities in the general population or the percentage of minorities attending college. Instead the law school's goals for minority enrollment are generally in line with the percentages of black and Mexican American college gradu-

ates in the State of Texas. These goals stem from the OCR investigation and the resulting Texas Plans. *Goode*, vol. 9 at 12–13; *Johanson*, vol. 4 at 9–12. They are reasonable and logically related to the size of the relevant pool of minority prospects for higher education.

The final factor, the impact of the procedure on the rights of innocent third parties, is the most difficult to evaluate. By definition, if one person is given preferential treatment based on race or ethnicity to overcome a heritage of past societal wrongs, another person is penalized. However, the person penalized or that person's ancestors may never have discriminated against the preferred race or ethnicity. Although the past history of societal discrimination in certain institutions may justify the remedy, in the end, individuals pay the price. Therefore, it is imperative that the mechanics of any program implementing race-based preferences respect and protect the rights of individuals who, ultimately, may have to sacrifice their interests as a remedy for societal wrongs.

In 1992, admissions subcommittees of three reviewed all the nonminority files. With the exception of Johanson and Hamilton, none of the members of the subcommittees reviewed the individual minority files. Nonminority applicants receiving no votes were denied admission without any further consideration or any direct comparison to minority applicants. In fact, as early as February 28, 1992, the law school had sent denial letters to 201 resident applicants, none of whom were black or Mexican American. P–43. By March 24, 1992, 718 denial letters had been sent to resident applicants, all to nonminority applicants. P–52. The law school did not reject any minority applicants until later in the admissions process. P–60.

The lack of individual comparison between minority and nonminority files resulted pri-

---

69. *See Goode*, vol. 9 at 32 ("My position on the committee for many years has been, we ought to work and strive to decreasing the gap, little by little if we have to, but one day to the point where, in fact, we won't have such a gap, where we can truly have a race-blind system of admission. We're not there."); *see also Wellborn*, vol. 24 at 35; P–1.

70. The evidence shows that the qualifications of minority applicants today are roughly equivalent to the qualifications of nonminority applicants 20 years ago. D–433. These figures demonstrate the progress that has occurred in the qualifications of minorities applying for law school. *Glenn*, vol. 23 at 52.

marily from the separate admissions procedures for minorities and nonminorities in the discretionary zone; this is the aspect of the procedure that is at issue with respect to the four plaintiffs in this cause, who were evaluated in the discretionary zone. However, the setting of different presumptive denial lines for minorities and nonminorities creates a similar problem: some nonminority applicants who fell below the nonminority presumptive denial line, though having a higher score than minority applicants placed in the discretionary zone, were rejected early in the process with no comparison to the individual minority applicants.[71] Further, although a presumptive denial score was established for minorities, in 1992, every minority applicant not admitted from the presumptive admit category was treated as if in the minority discretionary zone. P–103.

The defendants defend the system used in 1992 as more effective in controlling the use of race for limited, legitimate purposes than the previous procedure of commingling minority and nonminority files in the stacks of thirty, a procedure that allowed individual reviewers complete discretion on the extent, if any, to implement affirmative action. *Wellborn,* vol. 24 at 8–17. The defendants assert the 1992 process was also more efficient in that minority files were reviewed by the persons most experienced in reviewing and evaluating minority files. *Goode,* vol. 9 at 3. The defendants concede that in 1992, with the exception of Johanson and Hamilton, no members of the general admissions committee reviewed individual minority files. However, they contend that the full committee was sufficiently apprised of the relative strengths of the minority and nonminority applicant pools through information provided by the minority subcommittee. Because the minority subcommittee shared this information with the full committee, the defendants argue that the full committee could reach a consensus on the weight to give race in the admissions process and evaluate the nonminority stacks of files with the relative strengths of the applicant pools in mind. *Wellborn,* vol. 24 at 10, 14–16; *Goode,* vol. 9 at 8–9. The defendants also defend the law school's process as consistent with similar processes used at major law schools across the country.[72] However, review of admis-

71. The use of different presumptive admission lines to identify the top candidates in the different groups does not present the same problem for several reasons. First, the evidence shows that Johanson reviewed all candidates in the top category, both minority and nonminority. Additionally, those applicants that were not offered admission from this category were not denied admission but moved to the discretionary zone. Further, Johanson testified to the necessity of making offers of admissions to the top candidates in the minority pools as soon as possible because of the small pool of qualified applicants and the nationwide competition for them. A tool that considers the disparity in past educational opportunity based on historical discrimination to assist in attracting the top minorities does not create an undue burden on the rights of nonminorities when appropriately used. Conversely, the use of differing presumptive denial lines effectively removed some nonminority applicants from consideration early in the process without being provided a general, much less individual, comparison with a fully developed pool of minority applicants. One or two separate reviewers from the general admissions committee unilaterally made determinations with regard to these applicants. However, none of the plaintiffs in this lawsuit was affected directly by this aspect of the 1992 procedure. Further, the new admissions procedure adopted by the law school will no longer use presumptive denial lines to pre-

clude comparison of applicants. *See infra* note 87. The Court, therefore, need not address the issue. If the issue were before the Court, the Court would find this aspect of the procedure suffers from the same infirmity that use of the minority subcommittee created in the discretionary zone—lack of individual comparison between minority and nonminority applicants.

72. The defendants imply that because the law school's affirmative action is fundamentally similar to that used at the major law schools around the country, it is constitutional. The evidence, however, reflects that while there are similarities, the other programs differ significantly from that at issue in this cause. Judith Wegner, Dean of the University of North Carolina School of Law, testified by deposition that the University of North Carolina School of Law does not set separate presumptive admission and denial scores based on race, does not have waiting lists segregated by race, and does not have separate committee review based on race. *Wegner depo.* at 48–49. Robert Stein, Dean of the University of Minnesota Law School, testified that the University of Minnesota uses mechanisms in the admissions procedure similar in function to those used by the law school. However, all applicants offered admission at the University of Minnesota, with the exception of those offered "automatic" admission based on high indices, are ultimately

sions procedures for equal protection violations requires a fact-specific inquiry. The fact that other schools may use processes with similar components does not resolve the issue of whether the defendants deprived the four plaintiffs in this cause of equal protection under the law.

In *Bakke,* Justice Powell stated that although race or ethnicity could be a "plus" factor in consideration of a particular applicant, race or ethnicity should "not insulate the individual from comparison with all other candidates for the available seats." *Bakke,* 438 U.S. at 317, 98 S.Ct. at 2762. Justice Powell further discussed the importance of assuring applicants that they were treated as individuals in the admissions process:

> The applicant who loses out on the last available seat to another candidate receiving a "plus" on the basis of ethnic background will not have been foreclosed from all consideration for that seat simply because he was not the right color or had the wrong surname. It would mean only that his combined qualifications, which may have included similar nonobjective factors, did not outweigh those of the other applicant. His qualifications would have been weighed fairly and competitively, and he would have no basis to complain of unequal

treatment under the Fourteenth Amendment.

*Id.* at 318, 98 S.Ct. at 2762. The defendants contend this express language is limited in its application to only those affirmative action programs that, like the one at issue in *Bakke,* use a quota system to achieve diversity. They assert that Justice Powell's reasoning calling for a one-on-one comparison may have application when the primary objective is to obtain a diverse class based on a number of different qualifications. However, this reasoning does not apply, according to the defendants, when a primary objective is to remedy past discrimination. In such circumstances, the defendants maintain individuals need not be compared one-to-one, as long as the admissions committee had a generalized knowledge of the strengths of the minority and nonminority applicant pools.[73] The Court disagrees.

Overcoming the effects of past discrimination is an important goal for our society. The preservation and protection of individual rights are equally important. Society must be careful not to ignore the latter to achieve the former, for to do so would serve only to perpetuate actions of the type affirmative action attempts to redress. Two wrongs do

---

reviewed by the full admissions committee. *Stein,* vol. 18 at 12. The minority subcommittee does not have authority to admit applicants, only to recommend specific applicants to the full committee. *Stein,* vol. 18 at 48. Paul Brest, Dean of the Stanford Law School, testified his school uses a system comparable to that used by the law school, with a single admissions chair who has ultimate discretion on all admissions. *Brest,* vol. 22 at 19. Instead of a using a minority subcommittee, Stanford has one person that reviews minority files and makes recommendations to the admissions chair. *Id.* at 8–19. Until recently, that person reviewed only minority files. However, as the result of a recent settlement with OCR, the person began reviewing some nonminority files so that she would have a better sense of the entire pool of applicants and be able to make more appropriate comparisons between the applicants. *Id.* at 39.

**73.** Additionally, the defendants assert that nothing in the case law following *Bakke* suggests that individual comparison of files is required in an admissions process redressing past discrimination, and in fact, indications exist to the contrary. *See Croson,* 488 U.S. at 519, 109 S.Ct. at 735 (Kennedy, J., concurring) (narrow tailoring stan-

dards should not be so strict as to chill state's ability to voluntarily eliminate results of past discriminatory actions); *Sheet Metal Workers v. EEOC,* 478 U.S. 421, 471, 106 S.Ct. 3019, 3047–48, 92 L.Ed.2d 344 (1986) (narrow tailoring does not require specific beneficiaries of affirmative action be victims of past discrimination). The defendants assert that requiring a one-to-one comparison of over 4000 applicants a year would be incredibly burdensome. However, the Court finds no reason, when evaluating affirmative action in the educational context, that the protection afforded individuals under the Fourteenth Amendment should change based on the governmental goal that is to be achieved. Further, the defendants, citing *Bakke,* have asserted diversity as a constitutionally valid goal of the law school's affirmative action program. *Bakke* gives no indication that the burden to a school in implementing a constitutionally valid program should be considered as a reason to diminish the need for individual comparison. Additionally, more recent case law has made it clear that administrative convenience cannot support a finding that an affirmative action program is narrowly tailored to remedy the effects of past discrimination. *Croson,* 488 U.S. at 508, 109 S.Ct. at 729–730.

not make a right; nor does blatant discrimination cure the ills of past discrimination. Indeed, affirmative action that ignores the importance of individual rights may further widen the gap between the races that the law school so diligently attempts to close and create racial hostility. The only proper means of assuring that all important societal interests are met, whether in the context of creating diversity or redressing the ill effects of past wrongs, is to provide a procedure or method by which the qualifications of each individual are evaluated and compared to those of all other individuals in the pool, whether minority or nonminority.

The law school owes a duty to the citizens of Texas to allow access to a legal education to the best qualified applicants. This does not imply that those applicants with the highest numbers or most prestigious pedigrees are necessarily the best qualified. A multitude of factors, as discussed by Justice Powell in *Bakke*, should be considered in developing the best qualified class from a given group of applicants.[74] "Indeed, the weight attributed to a particular quality may vary from year to year depending upon the 'mix' both of the student body and the applicants for the incoming class." *Id.* at 317–18, 98 S.Ct. at 2762. To achieve the compelling governmental goal of remedying past discrimination, race and ethnicity are factors that deserve "pluses" in the weighing of qualifications. To achieve the compelling governmental goal of diversity, nonobjective qualifications of nonminorities and minorities alike may deserve a similar "plus" factor.[75] Only by comparing the entire pool of individual applicants can both these goals be achieved and the best qualified class of entering law students be admitted.

The law school's 1992 admissions procedure, in theory, was designed to select the best qualified applicants from the thousands of applications it received. In 1992, the law school's affirmative action program involved a determination of those applicants who were the best qualified from the entire minority pool and an attempt to enroll sufficient numbers of those applicants in the entering class to satisfy the compelling governmental objectives at issue. The law school evaluated all nonminority applications through a separate process, with the goal of admitting the best qualified nonminorities. The defendants maintain this bifurcated process does not violate the Fourteenth Amendment because affirmative action is lawful and those minorities selected are evaluated against nonminority applicants by comparison of the general qualifications of the two pools of applicants. The process, however, incorporates no meaningful evaluation between the applicants selected from each pool—a crucial element for protection of individual rights.

The Court holds that the aspect of the law school's affirmative action program giving minority applicants a "plus" is lawful. But the failure to provide comparative evaluation among *all* individual applicants in determining which were the best qualified to comprise the class, including appropriate consideration of a "plus" factor, created a procedure in which admission of the best qualified was not assured in 1992. Under the 1992 procedure, the possibility existed that the law school could select a minority, who, even with a "plus" factor, was not as qualified to be a part of the entering class as a nonminority denied admission. Thus, the admission of the nonminority candidate would be solely on the basis of race or ethnicity and not based on individual comparison and evaluation.

---

**74.** In addition to race, Justice Powell suggested "[s]uch qualities could include exceptional personal talents, unique work or service experience, leadership potential, maturity, demonstrated compassion, a history of overcoming disadvantage, ability to communicate with the poor, or other qualifications deemed important." 438 U.S. at 318, 98 S.Ct. at 2762.

**75.** A nonminority applicant from a disadvantaged background, although offered admission to prestigious colleges, who elects to attend less-prestigious schools for economic reasons but nonetheless performs well, seems to be penalized under the current system for not having financial means or opportunities commensurate with other nonminorities dealt a different lot in life. Therefore, the affirmative action program, as applied in 1992, seems to have had the somewhat ironic effect of affecting the rights of less advantaged and, indeed, even disadvantaged, nonminorities rather than the group of nonminorities as a whole.

This is the aspect of the procedure that is flawed and must be eliminated.

The constitutional infirmity of the 1992 law school admissions procedure, therefore, is not that it gives preferential treatment on the basis of race but that it fails to afford each individual applicant a comparison with the entire pool of applicants, not just those of the applicant's own race.[76] Because the law school's 1992 admissions process was not narrowly tailored, the Court finds the procedure violated the Equal Protection Clause of the Fourteenth Amendment.

## D. Effect of Process on Plaintiffs

The next issue the Court must address is whether, but for the manner in which the law school improperly considered race in its 1992 admissions procedure, the plaintiffs would have been offered admission. The defendants argue that the burden is on the plaintiffs to prove they would have been admitted. The plaintiffs argue that once they prove a constitutional violation, the burden shifts to the defendants to establish there was no but-for causation between the unconstitutional

procedure and the denial of admission to each plaintiff.

Generally, in cases where a plaintiff establishes a constitutional deprivation, the burden shifts to the defendant to establish a legitimate, nondiscriminatory reason for the action. *See, e.g., Carey v. Piphus,* 435 U.S. 247, 263, 98 S.Ct. 1042, 1052, 55 L.Ed.2d 252 (1978) (plaintiff seeking damages for due-process violation must show injuries resulted from denial of due process, not from corresponding justifiable deprivation); *Mt. Healthy City Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977) (once employee established conduct constitutionally protected, burden shifted to employer to show it would have reached same decision). Justice Powell's opinion in *Bakke* suggests the same holds true in Title VI discrimination suits when evidence of alternative reasons exists.[77] The Supreme Court has recently taken the analysis one step further in the context of Title VII discrimination cases and held that the failure of a defendant to produce credible evidence of legitimate nondiscriminatory reasons is insufficient to support a finding of discrimination

**76.** The record shows that two of the plaintiffs' applications were reviewed by members of the minority subcommittee who had familiarity with both pools of applicants, minority and nonminority. Initially, Johanson reviewed Hopwood's file early in the process before the entire pool of applications had developed. After he moved her to the discretionary zone, a subcommittee of three that included Hamilton reviewed her file. Elliott's file was reviewed by a subcommittee of three that included Johanson. Arguably, because Johanson and Hamilton had familiarity with individual minority applicant files, the procedure as applied to these two plaintiffs was not impermissible. However, because the other reviewers on the subcommittees had no familiarity with individual minority files, the Court finds the constitutional violation applies to all four plaintiffs. Additionally, the fact that these plaintiffs were reviewed by persons familiar with the entire pool was an inadvertent effect of Johanson's and Hamilton's dual roles and the random shuffle of the files into reviewing stacks; it did not result from the design of the procedure.

**77.** The trial court in *Bakke* placed the burden of proof on Bakke. Therefore, although the court found the Davis program violated Bakke's fourteenth amendment rights, it denied him injunctive relief because he had failed to prove he would have been admitted in the absence of the

impermissible program. On appeal, the Supreme Court of California, analogizing Bakke's situation to that of a plaintiff under Title VII, ruled that because Bakke established the university had discriminated against him, the burden of proof shifted to the university to prove that it would not have admitted him in the absence of the special admissions program. *Bakke v. Regents of Univ. of Cal.,* 18 Cal.3d 34, 132 Cal.Rptr. 680, 553 P.2d 1152, 1172 (1976). Because the university conceded its inability to carry the burden, the California court ordered Bakke's admission. *Id.* On review, the Supreme Court of the United States noted the burden shift but stated that because the university had not challenged that aspect of the decision, the issue of the proper placement of the burden of proof was not before it for consideration. *Bakke,* 438 U.S. at 280 n. 13, 98 S.Ct. at 2743 n. 13. At the end of his opinion, Justice Powell, affirming the injunction, noted that remanding the case would serve no useful purpose in light of the university's concession that it could not meet the burden imposed upon it by the burden shift. *Id.* at 320, 98 S.Ct. at 2764. In distinguishing *Bakke* from *Mt. Healthy City Board of Education v. Doyle,* Justice Powell noted that there was no question that race had been the reason for Bakke's rejection and no record existed in *Bakke* that legitimate alternative grounds for the university's decision existed. *Id.* at 320 n. 54; 98 S.Ct. at 2764 n. 54.

because the "ultimate burden of persuasion" remains at all times with the plaintiff. *See St. Mary's Honor Ctr. v. Hicks,* —— U.S. ——, ——, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407 (1993). In making this clarification, Justice Scalia stated that a court has no authority to impose liability upon an entity for alleged discriminatory practices unless a factfinder determines, according to proper procedures, that the entity has unlawfully discriminated. *Id.* at ——, 113 S.Ct. at 2751. Courts have borrowed the burden of proof standards formulated for Title VII in deciding claims brought under statutes prohibiting discrimination by educational institutions receiving federal funding. *See, e.g., Elston v. Talladega County Bd. of Educ.,* 997 F.2d 1394, 1404 (11th Cir.1993) (Title VI disparate impact claim). *But see Cohen v. Brown Univ.,* 991 F.2d 888, 901–02 (1st Cir.1993) (Title IX plaintiff bears burden of showing disparity and unmet interest).[78]

The Court finds that the cue in Justice Powell's opinion and the holdings of other constitutional cases suggest that a burden allotment similar to that in Title VII cases is appropriate. Therefore, because the plaintiffs established a prima facie case—they proved the law school's 1992 admissions procedure was constitutionally flawed—the burden shifted to the defendants to establish legitimate grounds for the decision not to admit these plaintiffs, notwithstanding the procedure followed. Unlike the university in *Bakke,* the defendants in this cause did not concede the plaintiffs would have been admitted had their applications been compared on a individual basis to minority files. Instead, they offered legitimate, nondiscriminatory reasons for denying each of the plaintiff's applications. D–332 (Hopwood, Elliott); D–334 (Hopwood, Carvell); D–335 (Carvell, Rogers); D–336 (Carvell). Further, a statistical analysis of the 1992 admissions data supports the defendants' assertion of the non-race based weaknesses in the plaintiffs' applications. D–338 at A–60—A–71.

The plaintiffs placed in evidence a chart created by the law school that depicts the TIs of all 1992 applicants and whether they were offered or denied admission. *See* P–139. The chart distinguishes minority and nonminority applicants, as well as residents and nonresidents.[79] The chart emphasizes the disparity in TIs between resident minority and nonminority applicants: the highest nonminority TI was 220, the highest black TI was 199 (the same as Hopwood's TI), and the highest Mexican American TI was 208. In the resident nonminority category, of fifty-one applicants with TIs of 199, six were denied admission. Additionally, the law school denied admission to ten nonminorities with TIs higher than Hopwood's TI. With regard to minority applicants with TIs of 199, the chart shows one black applicant, who was admitted, and three Mexican American applicants, all who were admitted.[80] With regard to a TI of 197, the TI shared by the other three plaintiffs, of fifty-seven resident nonminority applicants, the law school denied admission to nineteen. Only one black resident fell in this category, who was admitted. No Mexican–American applicants had a TI of 197.

On the other end of the scale, out of four black resident applicants with a TI of 185, one was denied admission. However, the law school offered admission to one nonminority resident with the same TI. Applicants with the lowest TI offered admission were all minorities.[81] However, the lowest nonminor-

---

**78.** The court in *Cohen* held that the burden shift applicable to Title VII cases should not apply to Title IX cases, a statute similar to Title VI. Among the reasons the court offered were the different scope and purpose of the two statutes and the largely aspirational goal of Title IX in comparison to the peremptory goal of Title VII. 991 F.3d at 902.

**79.** The Court has focused on the statistics for residents in this discussion. The Court notes the chart reflects across-the-board higher numbers for nonresidents and correspondingly more difficult thresholds for admittance.

On the chart, "D" indicates denied, "A" indicates admitted, and "C" indicates cancelled. For purposes of evaluation of the numbers, applicants in the "C" category are counted as admissions because they were admitted but cancelled the acceptance. *See Johanson,* vol. 6 at 16.

**80.** Two of the Mexican American applicants cancelled.

**81.** Of five black applicants with a TI of 183, the law school admitted three; of eleven Mexican American applicants, the law school admitted two (one cancelled).

ity TI was only a couple of points higher at 185.

There are many possible methods of evaluating the numbers on the chart and making comparisons of the applicants' relative TIs. The plaintiffs placed the chart in evidence to show their numerical standing above that of the majority of minorities offered admission. The Court agrees with the plaintiffs that the chart shows a significant disparity in TIs between the minority and nonminority pools. But the visual depiction of this disparity further reinforces the Court's finding that the evaluation of applicants must include other nonobjective factors to achieve the compelling governmental interest of overcoming the past effects of discrimination.

What the chart does not prove, however, is that race or ethnic origin was the reason behind the denial of admission to the plaintiffs. Although the plaintiffs had higher TIs than the majority of minority applicants offered admission, the evidence shows that 109 nonminority residents with TIs lower than Hopwood's were offered admission.[82] Sixty-seven nonminority residents with TIs lower than the other three plaintiffs were admitted.[83]

Additionally, the Court has reviewed the files of the four plaintiffs as well as the files placed in evidence of other applicants reviewed in the discretionary zone, both minority and nonminority. P–146 to P–150, P–155 to P–164 (white applicants admitted); P–224 to P–237 (black and Mexican American applicants admitted). Based on the applications in evidence, it appears the majority of applicants, both minority and nonminority, made considerable effort to inform the admissions committee of their special qualifications through extensive answers to the questions on the application form or through personal statements. *See* P–146 to P–150, P–155 to P–163, P–225 to P–237. Most files contained one, if not several, letters of recommendation. *See, e.g.,* P–155, 157, 158, 161, 225, 231, 233–236. In fact, of all the applications the

Court reviewed, Hopwood's provides the least information about her background and individual qualifications and is the least impressive in appearance, despite her relatively high numbers. The files further reveal that both minorities and nonminorities were offered admission from the waiting lists. *See* P–146, 148, 156, 158, 162 (nonminority); P–231, 285 (minority).

In reviewing these files, the Court appreciates the difficulty of the task facing the admissions committee each year. Evaluation of applications involves both objective and subjective factors, and the Court is aware that some evaluators could use subjectivity to conceal discriminatory motives. As a general rule, however, judges are not as well suited to evaluate qualifications of applicants as those who are familiar with the process and have many years of experience evaluating applications. *See Odom v. Frank,* 3 F.3d 839, 847 (5th Cir.1993). The Court's review revealed a group of applicants with varying backgrounds and accomplishments, but none so clearly better qualified, in the Court's view, as to require that individual's selection over that of another in the group.[84] The Court sees no disparities in the applications of the admitted minorities when compared to those of the plaintiffs "so apparent as virtually to jump off the page and slap [the Court] in the face." *Id.* Without such a disparity, the Court cannot and will not substitute its views for those of admission committee members with years of experience and expertise in evaluating the law school applications. *See id.*

Therefore, the Court finds the defendants have met the burden of producing credible evidence that legitimate, nondiscriminatory grounds exist for the law school's denial of admission to each of the four plaintiffs and that, in all likelihood, the plaintiffs would not have been offered admission even under a constitutionally permissible process. The plaintiffs, who maintain the ultimate burden

---

82. Twenty-nine of these applicants canceled.

83. Thirteen of these applicants canceled.

84. The Court notes that several of the applicants, some of which, in the Court's opinion, were

weaker candidates, initially were denied admission but offered a position on the waiting list. They were offered admission relatively late in the process from the waiting list.

of persuasion, have failed to prove otherwise.[85] The Court simply cannot find from a preponderance of the evidence that the plaintiffs would have been offered admission under a constitutional system.

The Court is mindful that the ultimate burden on the plaintiffs is a difficult and, perhaps, almost impossible obstacle to overcome in a case of this nature.[86] However, the Court may not ignore the precedent of other constitutional cases because, as a practical matter, the burden may be too difficult for plaintiffs to overcome.

## E. Relief and Damages

The plaintiffs seek declaratory and injunctive relief, as well as compensatory and exemplary damages. Because the Court has found the admission procedure the law school used in 1992 was not narrowly tailored in that it impermissibly and unnecessarily harmed the rights of the plaintiffs, the Court will enter a judgment providing the plaintiffs with their requested declaratory relief. Specifically, the Court will enter judgment that the law school's use of the separate evaluative processes for minority and nonminority

applicants in the discretionary zone violated the Fourteenth Amendment.

However, "the right to equal treatment guaranteed by the Constitution is not coextensive with any substantive rights to the benefits denied the party discriminated against." *Heckler v. Mathews*, 465 U.S. 728, 739, 104 S.Ct. 1387, 1395, 79 L.Ed.2d 646 (1984). As discussed above, the Court cannot find from a preponderance of the evidence that the plaintiffs would have been admitted under a constitutional system. The Court, therefore, will not order injunctive relief. Nor does the Court find prospective injunctive relief necessary in light of the law school's voluntary change to a procedure, which on paper and from the testimony, appears to remedy the defects the Court has found in the 1992 procedure.[87] Further, neither a plaintiff denied admission under the new system nor evidence of the practical application of the new procedure is before this Court.

Although the plaintiffs have failed to prove an injury-in-fact, they have proved they were deprived of their right to equal treatment. The appropriate relief for a denial of equal treatment in a discriminatory government

**85.** In this cause, the plaintiffs' initial position was that any consideration of race in an admissions procedure is improper. Upon the Court's indication that such a position was untenable under the law, the plaintiffs redirected their efforts to proving the law school improperly used race in the admissions process. However, the plaintiffs' causation evidence consisted of a demonstration that many more minority students were admitted in 1992 than would have been under a strictly race-blind process and that, had the plaintiffs been minorities, there was a high probability they would have been offered admission. *Johanson*, vol. 5 at 37; vol. 6 at 18–19. This evidence, although proof of affirmative action, does not establish that the plaintiffs, who are not minorities, would have received sufficient votes to be offered admission if individual minority files had been reviewed by the general admissions committee.

**86.** In closing argument, the plaintiffs' counsel stated the plaintiffs could not prove they were denied admission because of their race because it was an impossible burden to meet. *T. Smith*, vol. 26 at 11, 40. Justice Souter, in expressing concern for Title VII plaintiffs with similar burdens, criticized the holding in *St. Mary's* as establishing a scheme, which, as a practical matter, could never be met by a plaintiff without

direct evidence of discrimination. *St. Mary's*, —— U.S. at ——, 113 S.Ct. at 2761 (Souter, J., dissenting).

The Court agrees that the plaintiffs have an impossible burden absent direct evidence. However, the difficulty does not stem from the unconstitutional aspects of the procedure alone but from the random shuffle of files into stacks of thirty, with each stack reviewed by different subcommittees of three. Under such a system, it is virtually impossible to establish the outcome of a comparison of the plaintiffs' applications against the other applicants, whether minority or nonminority.

**87.** The law school followed the admissions procedure used in 1992 in 1993 and 1994. However, for selecting the 1995 entering class, the law school has established a new procedure that eliminates the minority subcommittee. D–363. All admissions decisions will be made by a small "administrative admissions group," which will be comprised of Johanson, Hamilton's successor, Dean Tonya Brown, and a faculty member who, as of the trial date, had not been selected. The new procedure will not use presumptive admission and denial scores. *Johanson*, vol. 6 at 34. The law school changed its procedure because "when one gets sued in federal court it catches one's attention." *Id.* at 57.

program is a remedy mandating equal treatment.[88] Therefore, the Court finds it appropriate to allow the plaintiffs to reapply to the law school for admission in the 1995 entering class, if they so desire, without requiring them to incur further administrative costs, and for them to be fairly evaluated in comparison to all other applicants for admission in 1995.[89]

In addition, though the plaintiffs did not prove they suffered any other actual injury, the Court will not ignore the gravity of the noneconomic injury to persons denied equal treatment. Therefore, although normally assessed in the context of procedural due-process violations, the Court believes this to be an appropriate case for the assessment of nominal damages:

> By making the deprivation of such rights actionable for nominal damages without proof of actual injury, the law recognizes the importance to organized society that those rights be scrupulously observed; but at the same time, it remains true to the principle that substantial damages should be awarded only to compensate actual injury or, in the case of exemplary or punitive damages, to deter or punish malicious deprivations of rights.

*Carey v. Piphus*, 435 U.S. at 266, 98 S.Ct. at 1054. The Court, therefore, will award each plaintiff nominal damages of one dollar.

With regard to general monetary damages, the evidence at trial consisted of each plaintiff's testimony and speculation about the value of a law degree.[90] Because the plaintiffs have failed to establish that they would have been admitted under a constitutional system, they are not entitled to these damages. Further, had the plaintiffs been entitled to damages, none of them established

monetary damages as required under the law and rules of this circuit. *See Haley v. Pan American World Airways*, 746 F.2d 311, 316 (5th Cir.1984) ("A damage award cannot stand when the only evidence to support it is speculative or purely conjectural."). Finally, the Court would not award Title VI damages even were such damages appropriate because the Court does not believe the defendants intended to discriminate against the plaintiffs in an unlawful manner. *See Carter v. Orleans Parish Pub. Schs.*, 725 F.2d 261, 264 (5th Cir.1984) (recovery of damages under Title VI precluded unless action intentional or manifested discriminatory animus); *Marvin H. v. Austin Indep. Sch. Dist.*, 714 F.2d 1348, 1356–57 (5th Cir.1983) (same). Indeed, the evidence reflects the contrary. The defendants acted in good faith and made sincere efforts to follow federal guidelines and to redress past discrimination. The record contains no evidence that the defendants intended to discriminate against or to harm the plaintiffs. Under these facts, an award of damages, especially the punitive damages the plaintiffs request, would be inappropriate.

## V. CONCLUSION

It is regrettable that affirmative action programs are still needed in our society. However, until society sufficiently overcomes the effects of its lengthy history of pervasive racism, affirmative action is a necessity. Further, although no one likes employing racial classifications and distinctions, "it would be impossible to arrange an affirmative action program in a racially neutral way and have it successful." *Bakke*, 438 U.S. at 407, 98 S.Ct. at 2808 (Blackmun, J., concurring in part and dissenting in part).

---

**88.** *See Heckler*, 465 U.S. at 740, 104 S.Ct. at 1395. This remedy may be accommodated by an end to preferential treatment of others. *Id.* at n. 8. In the context of affirmative action, the Court interprets this to mean an end to *unlawful* preferential treatment of others.

**89.** Because plaintiff Carvell has taken advantage of the opportunity to obtain a legal education at SMU, this aspect of the remedy may have little value to him. Carvell, in all probability, will be a practicing member of the bar long before the other plaintiffs, if offered admission to the law

school under a constitutional admissions procedure, obtain law degrees.

**90.** Elliott testified he thought the median income for recent law school graduates was $57,000 per year. *Elliott*, vol. 7 at 30. Rogers had a somewhat less inflated concept, testifying the average first-year salary for a graduate from the law school was $52,000. Rogers also testified that the defendants had "taken the top off my career" and requested some amount he could not quantify to compensate him for the loss. *Rogers*, vol. 11 at 67.

Commitment to affirmative action programs in educational institutions as just and necessary, however, does not imply that the individual rights of nonminorities should fall by the wayside or be ignored. The concern for individual rights requires that programs implementing racial and ethnic preferences be subjected to the most searching judicial examination of strict scrutiny. Only by applying strict scrutiny can the judicial branch assure society that the important individual rights protected by the Fourteenth Amendment have not been unnecessarily and unfairly burdened solely as a function of the color of an individual's skin. The judicial branch must carefully and honestly assess the harm to those individual rights in light of the compelling interests served and benefit bestowed upon society by the affirmative action program. To do otherwise would do little more than, in the words of Justice Kennedy, move us from "separate but equal" to "unequal but benign." *Metro Broadcasting*, 497 U.S. at 638, 110 S.Ct. at 3047 (Kennedy, J., dissenting).

Further, if we wish to progress to a society in which affirmative action is no longer necessary, we must be cognizant of pitfalls and dangers created by affirmative action in the form of the stigma some associate with racial preferences and the potential institutionalization of a process that was designed to overcome institutionalized discrimination. The interests of all require that the government not diminish the importance of individual rights, whether belonging to a minority citizen or a nonminority citizen, through programs, that although well-intentioned, unwittingly "permit the seeds of race hate to be planted under sanction of law." *Plessy v. Ferguson*, 163 U.S. 537, 560, 16 S.Ct. 1138, 1147, 41 L.Ed. 256 (1896) (Harlan, J., dissenting).

The Court realizes that some individuals will continue to complain that any admissions program employing preferences based on race, no matter how carefully designed and administered to provide individualized consideration, deprives nonminorities of their rights. However, when the program functions to overcome the effects of years of discrimination and to serve important societal goals, affirmative action "is consistent with equal protection principles as long as it does not impose *undue* burdens on nonminorities." *Metro Broadcasting*, 497 U.S. at 597, 110 S.Ct. at 3026. The Court believes the only way of assuring an *undue* burden is not placed on innocent parties in an admissions procedure is to treat *all* applicants as individuals and to consider *all* qualifications in selecting the best qualified candidates to comprise an entering class. Using the color of an applicant's skin to limit the degree of individual comparison between the races neither serves societal goals nor sufficiently protects individual rights under our Constitution.[91]

Judgment will be issued consistent with the Court's findings in this opinion.

## FINAL JUDGMENT

BE IT REMEMBERED on the 19th day of August 1994, the Court entered its memorandum opinion consisting of its findings of fact and conclusions of law in the above-captioned matter and, consistent with those findings and conclusions, enters the following judgment:

IT IS ORDERED, ADJUDGED, and DECREED, by declaratory judgment, that the 1992 admissions procedure of the law school at the University of Texas at Austin, as administered, was in violation of the

---

91. "The hand that rounded Peter's dome,/ And groined the aisles of Christian Rome,/ Wrought in a sad sincerity./ He builded better than he knew!"

Those who devised the Fourteenth Amendment wrought in grave sincerity. They may have builded better than they knew.

They vitalized and energized a principle, as old and as everlasting as human rights. To some of them, the sunset of life may have given mystical lore.

They builded, not for a day, but for all time; not for a few, or for a race; but for man. They planted in the Constitution a monumental truth ... the golden rule. Roscoe Conkling, Oral Argument in *County of San Mateo v. Southern Pacific R.R.,* 116 U.S. 138, 6 S.Ct. 317, 29 L.Ed. 589 (1885), in *Oral Argument on Behalf of Defendant by Roscoe Conkling* 34 (1883).

14th Amendment of the United States Constitution;

IT IS FURTHER ORDERED, ADJUDGED, and DECREED that Cheryl J. Hopwood, Douglas W. Carvell, Kenneth R. Elliott, and David A. Rogers shall be entitled to reapply for admission to the law school at the University of Texas at Austin for the 1995–96 school year without further administrative expense or fees and that their applications shall be reviewed by the admissions committee of the law school at the University of Texas at Austin along with all other applications for that school year;

IT IS FURTHER ORDERED, ADJUDGED, and DECREED that Cheryl J. Hopwood, Douglas W. Carvell, Kenneth R. Elliott, and David A. Rogers do have and recover judgment of and against the defendants University of Texas at Austin and the University of Texas School of Law, jointly and severally, in the total amount of One Dollar ($1.00) each;

IT IS FINALLY, ORDERED, ADJUDGED, and DECREED that all further affirmative relief requested by any party herein against any other party herein is DENIED.